UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Hechinger Investment Company of | ) | Case No. 99-02261 ( PJW ) |
| Delaware, Inc., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| Hechinger Liquidation Trust as successor | ) | |
| in interest to Hechinger Investment | ) | |
| Company of Delaware, Inc., *et al.*, Debtors | ) | Adversary Proceeding |
| in Possession, | ) | No. 01-3170 (PBL) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Universal Forest Products, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION** [1]

**I.  BACKGROUND**

This is an action brought under Sections 547 and 550 of the Bankruptcy Code,[2] seeking to avoid and recover transfers in the amount of $16,703,604.57[3] to Defendant Universal Forest

---

[1] This Memorandum constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Rule 9014.

[2] 11 U.S.C. §§ 101 et seq.  References herein to statutory provisions by section number only will be to provisions of the Bankruptcy Code, unless the contrary is clearly indicated.

[3] This is the amount set out in Plaintiff's amended complaint filed August 15, 2001. Discrepancies between this amount and the amounts recited in the parties' subsequent pleadings and trial briefs do not affect the issues ultimately contested at trial and will not be addressed.

Products, Inc. (hereafter, "Defendant" or "UFP") during the 90-day period prior to the June 11, 1999 filing of Debtors' petitions in bankruptcy (the "Preference Period," March 13 to June 11, 1999).

Prior to trial in this matter, the parties filed and thoroughly briefed Cross Motions for Summary Judgment. In its motion, UFP asserted that of the payments to it, $13,125,822.00 were actually advance payments, and that advance payments, by definition, were not for or on account of an antecedent debt owed by the debtor before the transfers were made.[4] Plaintiff conceded that certain of the transfers were advance payments, but contended that the proper amount was $6,576,603.36.

On December 14, 2004, this Court issued its Memorandum, in which we held, *inter alia*, that since the parties were in agreement as to at least $6,576,603.36, Plaintiff's Motion for Summary Judgment should be denied and summary judgment should be granted in favor of UFP as to that amount. In its motion, UFP claimed that the transfers could not be avoided because they were made in the ordinary course of business pursuant to § 547(c)(2), they constituted contemporaneous exchanges for new value pursuant to § 547(c)(1), or that after the transfers, new value was given by UFP to or for the benefit of the debtor pursuant to § 547(c)(4). In our Memorandum, this Court found that there remained genuine issues of material fact as to the ordinary course of business and the contemporaneous exchange for new value defenses, and that therefore summary judgment on those issues was not appropriate. This Court stated that it was inclined to grant summary judgment in favor of UFP in the amount of $8,856,126.72 on its new

---

[4] Section 547(b)(2). The remaining elements of Section 547(b) were either conceded by UFP or were otherwise established as to all of the payments.

value defense under § 547(c)(4). Since § 547(c)(4) was available only as to new value given to or for the benefit of the debtor which was "not secured by an otherwise unavoidable security interest" and "on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor,"[5] and since the avoidability of the transfers under other claimed defenses had not been established, the Court was unable to grant such relief.

Following the issuance of this Court's December 14, 2004 Memorandum, the parties entered into further negotiations, discussions, and trial preparation. The parties ultimately entered into stipulations resolving some of the fact issues described in the Court's Memorandum, and incorporated them into the Joint Pretrial Memorandum required by this Court prior to trial, and into their respective Trial Briefs.

The parties stipulated that Plaintiff has established a *prima facie* case under § 547(b) as to all transfers that were not advances, that payments by Debtor to UFP during the Preference Period on account of antecedent debt totaled $7,544,335.92, and that the "net preference" at issue at trial, without allowance for any other defenses, was $1,004,216.03. Thus, the issues remaining for trial were UFP's claimed defenses of "contemporaneous exchange for new value" under § 547(c)(1) and "ordinary course of business" under § 547(c)(2).[6]

Trial was held before this Court on February 25, 2005, and at the conclusion of the evidence, the parties were permitted to prepare and file written statements or briefs, in lieu of oral closing arguments. The Court took the matter under advisement and is now prepared to

---

[5] Section 547(c)(4)(A), (B).

[6] The parties also stipulated and agreed to the net preference amount which would remain in the event the Court found that UFP had an allowable defense for payments made, respectively, within 1, 2, 3, 4, 5, 6, 7, or 8 days of invoice. (Amended Joint Pretrial Memorandum, D.I. 109, ¶¶ 23-29.)

render its decision.

## II.  THE EVIDENCE

Section 547(g) provides that Plaintiff has the burden of proving the avoidability of a transfer under § 547(b), and Defendant has the burden of proving the nonavoidability of a transfer under § 547(c).  Since the establishment of Plaintiff's *prima facie* case under § 547(b) was stipulated by the parties, Plaintiff's initial burden was met.  Defendant, therefore, had the burden of proving its defenses to avoidance under § 547(c), and presented its evidence first.

Defendant's first witness was Gerald Brian Schumaker, Credit Manager for UFP for the past 10 years.  The following is a summary of Mr. Schumaker's testimony.

UFP is the current leading manufacturer of treated lumber products, and was as well in 1999.  Its annual sales in 1999 were approximately $1.2 billion with 4,200 customers and are currently approximately $3 billion with 6,000 customers.  UFP's business relationship with Hechinger spanned some 15 years prior to Hechinger's bankruptcy.  Prior to February 1999, Hechinger, which was characterized as a "Big Box" retailer, was one of UFP's largest customers for treated lumber products.  It had an open credit line, without limitation, on terms of 1% 10 days, net 30, with a 7-day mail float, so that the 1% discount was earned if payment for an invoice was received within 17 days of the invoice date.

On February 4, 1999, UFP set up a meeting with Hechinger's management regarding Hechinger's financial distress and proposing four possible solutions to permit a continuation of the companies' relationship. (Plaintiff's Exhibit 29)  The fourth solution proposed was the establishment of a credit limit for future purchases.  As a result of the meeting between the parties, a $1 million credit limit was established for Hechinger, its credit terms were reduced to

1% 7 days, net 8, and the credit limit was to be closely monitored. Hechinger was also to remit payments by wire transfers, in lump sum amounts of $500,000 or $1 million, as required by credit limit calculations, which were to include the account receivable balance, invoiced orders and "orders in the system." (Plaintiff's Exhibit 34) Prior to this change, Hechinger had not previously paid by wire transfer, nor in lump sums, but rather had paid by check accompanied by remittance advices matching the remittance to particular previous invoices. After the change, payment was made solely by wire transfer, and remittance advices were not received until two to four weeks after each payment. Mr. Schumaker conceded that other "Big Box" retailers during this period had open credit lines and were on terms of 1% 10, net 30, and that the new terms for Hechinger would not have been normal for large accounts in 1999. He also admitted that the handling of the Hechinger account by UFP at that time was not ordinary, in that the effort to maintain "zero exposure" was an exception called for by the need to watch the account closely.

    Defendant next called Ms. Beth Nickels, Chief Financial Officer of Herman Miller Company, and the former CFO of UFP at all times relevant to this action. Ms. Nickels testified that the result of imposition of a credit limit on a high volume customer, which Hechinger was prior to its bankruptcy, was to necessitate payment in advance, frequent wire transfers, or stopped shipments, and that monitoring such a limit was difficult both for UFP and Hechinger. On cross-examination, she stated that she had been told and believed that so long as UFP was paid within terms, it would not be subject to preference liability in the event of Hechinger's bankruptcy. Certain e-mail correspondence within UFP in September 1997 and March 1998 had expressed concern about Hechinger's financial condition, and it was suggested that if possible, UFP should find a way to shorten Hechinger's credit terms. (Plaintiff's Exhibits 3, 18) Ms. Nickels

5

conceded that the February 1999 change of credit terms was a significant departure from the historic dealings between the parties.

Both Mr. Schumaker and Ms. Nickels reviewed internal UFP correspondence indicating that the shipment of Hechinger orders was intentionally slowed or held up in order to try to hold UFP's credit exposure at or near zero. A distinction was recognized and discussed between the amount of UFP's credit exposure, which consisted of the accounts receivable balance on UFP's books attributable to Hechinger, and the extent to which Hechinger was using its credit line, the computation of which included the accounts receivable balance and the amount of any unshipped orders for goods which were in the "pipeline" but not yet shipped and therefore not yet invoiced.

Plaintiff called as its first witness Mr. Clifford C. Smith, Jr., Executive Vice President of Hechinger during the critical period involved here. Mr. Smith testified that none of the alternatives proposed by UFP in its February 4 letter and at the February 12 meeting (Plaintiff's Exhibits 29 and 34) was initially acceptable, and that any requirement of a guarantee, a letter of credit to secure open accounts receivable, or payment in advance for merchandise, the first three of the four proposals, would have resulted in Hechinger terminating the relationship between the companies. The fourth alternative, the establishment of a credit limit, a reduction in terms, and the requirement of wire transfers in lump sum amounts without concurrent remittance advices, was ultimately accepted, according to Mr. Smith, because the timing of the UFP demands was such that it was too close to the busy season (March through July) for Hechinger to be able to find another supplier for treated lumber. He testified that both parties knew that the credit limit would be difficult to administer, since Hechinger stores would place orders with UFP for between $160,000 and $250,000 of product each day. He further stated that he was never

6

advised that the credit limit had been reduced to $500,000, and that such a limit would not have been workable due to the volume of business between the parties. On cross examination, Mr. Smith was presented with a document indicating that such a reduction had in fact been communicated to UFP.

Hechinger next called Mr. James F. Iampieri, the former Vice President of Merchandise Administration for Hechinger, who described certain exhibits depicting the payment history between Hechinger and UFP both before and during the preference period. Mr Iampieri also testified regarding Hechinger's credit and payment terms and methods with UFP and with its numerous other vendors.

At the conclusion of the evidence, the parties agreed to prepare brief written submissions in lieu of closing arguments. These submissions have been reviewed by the Court, as has a transcript of the testimony educed and the exhibits offered and admitted at trial.

### III. DISCUSSION

There is no doubt that the business and credit relationship between Hechinger and UFP was substantially changed by the February 4, 1999 letter and the subsequent meeting regarding it. Prior to that time, Hechinger had an unlimited open line of credit on 1% 10 days, net 30 terms.[7] Thereafter, UFP imposed a $1 million credit limit and reduced the terms to 1% 7 days, net 8. Because the Hechinger stores were placing product orders with UFP of $160,000 to $250,000 daily, the combination of the two changes necessitated larger and much more frequent payments. Whereas Hechinger had theretofore invariably paid UFP by check in the exact amount of the

---

[7] Although there is a reference in the fact issues of UFP set out in the Amended Joint Pretrial Memorandum that UFP imposed stricter credit terms on Hechinger for a short period during 1998, the same was not mentioned at trial.

invoices being paid, transmitted by mail and accompanied by definitive remittance advices, it was then required to make more frequent payments in large lump sums by wire transfer, with remittance advice being delayed by two weeks or more after the payment. All of the payments during the preference period were by wire transfer and in the amount of either $500,000 or $1 million.

Much significance was attributed by UFP, in its trial brief, at trial and in its post-trial submission, to its contention that the credit limit imposed upon Hechinger included not only the amount of accounts receivable on the books of UFP (representing goods previously shipped and invoiced concurrent with shipment), but also the amount of orders received by UFP from Hechinger stores but not yet shipped. Hechinger contends that this was not its understanding. It considered the credit limit to consist of only the accounts receivable balance, and that it therefore believed that its payments were being applied to reduce existing indebtedness to make room for the shipment of orders "in the system" but not yet shipped. The shipment of received orders would immediately result in the issuance of invoices and the addition of the amount to the accounts receivable balance, and it would be expected that UFP would not ship orders which would result in Hechinger being over its credit limit. This Court therefore considers this to be a distinction without a difference, except to the extent that it may be seen to impact UFP's "contemporaneous exchange for new value" defense under § 547(c)(1).

By way of example, if Hechinger's account on UFP's books showed $800,000 of unpaid invoices and there were $250,000 of unshipped orders "in the system," UFP would consider that Hechinger was at $1,050,000, which is $50,000 over its credit limit, and would not ship the orders. Hechinger would consider that it was $200,000 under its credit limit, but would realize

that the unshipped orders would put it over the limit without a prior reduction in the receivable balance. Thus, when Hechinger wired $500,000 to UFP, it would consider the payment as reducing the unpaid invoices to $300,000. UFP would consider the payment as reducing the credit to $550,000. In either event, the unshipped orders could be shipped and invoiced without Hechinger being over its credit limit. A $1 million payment in the foregoing scenario would be an overpayment of existing invoices and result in prepayment, or advance payment, of subsequent shipments.

As has been noted above, the parties have stipulated and agreed that during the preference period, advance payments in the amount of almost $9 million were made by Hechinger to UFP. The fact that Hechinger contends that it was not aware that it was, nor did it intend to be, paying for goods in advance, does not change the stipulation or the result.

### A. Contemporaneous Exchange for New Value Defense

In order to establish the nonavoidability of a transfer or transfers under § 547(c)(1), UFP must prove each of the elements of that provision.[8] In assessing the applicability of the contemporaneous exchange for new value defense, the key element is the intent of the parties. *In re Spada*, 903 F.2d 971, 975 (3rd Cir.(Pa.), 1990).

Hechinger is adamant in its assertion that it never intended any of its transfers to UFP to be a contemporaneous exchange for new value given or to be given to it by UFP. Although a significant amount of the transfers made during the preference period were in fact payments either in advance or virtually simultaneous with shipments, Hechinger nevertheless contends that

---

[8] That such transfer was — (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange. § 547(c)(1)

9

during that period it always believed, and that UFP led it to believe, that it was doing business with UFP on a debtor/creditor basis, on credit terms and with a fixed credit limit. Advance or simultaneous payments, according to Hechinger, resulted from the interaction of the newly imposed credit limit with the high volume of orders during its busy season for treated lumber sales. Hechinger points out that the remittance advices it provided following the transfers, directed that payments be applied to specific invoices, and that UFP honored that direction and applied the payments as requested. Further, while Hechinger, in the numerous phone conversations with Mr. Schumaker and Ms. Nickels, could have matched payments to specific order numbers and therefore earmarked the payments, it did not do so. Mr. Schumaker testified that UFP placed payments in an unapplied category on its books pending receipt of remittance advices from Hechinger, then applied the payments to the prior invoices as directed and specified in those advices.[9] Hechinger urges that these facts support its argument that neither Hechinger nor UFP possessed the requisite intent necessary to sustain UFP's claimed defense under § 547(c)(1).

In *In re Contempri Homes, Inc.*, 269 B.R. 124 (Bankr.M.D.Pa., 2001), the defendant's assertion of a § 547(c)(1) defense was rejected where the court found that both parties intended the payments to be applied to the oldest invoices. In this connection, the court stated:

> [P]ayments made to a supplier of goods as a prerequisite to the shipping of more goods to the debtor are not intended by the parties as a contemporaneous exchange for new value even though the payments roughly correspond to the value of the new goods shipped.

---

[9] Mr. Schumaker testified that UFP did not apply the payments to particular invoices prior to receiving the remittance advices from Hechinger, because it wanted its records to agree with those of its customer.

*Id.*, at 129. The defendant had argued that the parties had created a "modified C.O.D." arrangement, where the defendant required the debtor to make a payment approximating the amount of goods to be shipped in order for the debtor to stay within its credit limit. In that case, however, the payment was remitted by check, accompanied by a remittance advice specifying the oldest invoices, and the payment was applied by the defendant as requested. Here, while UFP contends that its frequent telephone calls had requested that Hechinger to pay for unshipped orders, the record supports Hechinger's argument that such calls merely alerted Hechinger to the fact that orders could not be shipped unless and until Hechinger remitted funds to reduce its outstanding debt to a point at which the subsequent shipments would not put it over its credit limit.

It is well established that the § 547(c)(1) defense may not be applied to credit transactions. *See*, *In re Samar Fashions, Inc.*, 109 B.R. 136, 139 (Bankr. E.D. Pa., 1990) (stating the rule that section 547(c)(1) applies only to cash or quasi-cash transactions); *In re Family Home Sales Center, Inc.*, 65 B.R. 176, 177 (Bankr.N.D.Ga., 1986) (same); *Kallen v. Litas*, 47 B.R. 977, 983 (N.D.Ill., 1985) (same). This Court agrees that the nature of a credit relationship is inconsistent with the intent which is required in order to sustain the § 547(c)(1) defense. Therefore, with respect to this proceeding, the Court finds that UFP has failed to sustain its burden under § 547(g) with respect to the § 547(c)(1) defense.

### B. Ordinary Course of Business Defense

UFP may still succeed in defeating the avoidance and recovery of the transfers in question if it can establish that it is entitled to the "ordinary course of business" exception contained in § 547(c)(2) as to some or all of the transfers. In order to do so, UFP again has the burden of proof

11

under § 547(g), and it must prove each of the three elements of that provision:

> (2) to the extent that such transfer was—
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms

11 U.S.C. § 547(c)(2).

In this case, it is conceded that the debts paid by the transfers in question were incurred in the ordinary course of the business and affairs of Hechinger and UFP. Thus, the issue before the Court is whether UFP has proven that it qualifies for the exception under both subsections (B) and (C) of § 547(c)(2).

UFP relies upon the fact that the changes in the credit terms and the application of a credit limit, occurred prior to the commencement of the preference period, that they were in effect during the entire period, and that the changes were agreed to by Hechinger. It is noted that the changes took effect on or about February 15, 1999[10] and that the preference period began on March 13, 1999. It is further noted that the testimony of Plaintiff's witness was to the effect that given the timing of UFP's demands, just prior to Hechinger's peak season for the sale of treated wood products, it had little or no choice but to accede to the lesser of the four unsatisfactory options presented to it by UFP.

UFP further relies upon *Robert F. Troisio v. E. B. Eddy Forest Products Ltd. (In re Global Tissue LLC*, 302 B.R. 808 (D.Del., 2003), *aff'd*, 106 Fed. Appx. 99, 2004

---

[10] Plaintiff's Exhibit 34.

U.S.App.LEXIS 14003 (3rd Cir., 2004). In that case, the Bankruptcy Court found that the creditors/defendants had proven all three elements of § 547(c)(2), and that therefore they were entitled to the exception from avoidance and recovery contained therein. The trustee argued that the three payments in question were accelerated from what was "ordinary" between the parties, the creditors had made telephone calls to the debtor, and overnight payments were required to ensure that new shipments would not be delayed. The Court of Appeals found that the payments in question fell within the same 30 to 50 day range as was ordinary during the pre-preference period, excluding a short period of severe delinquency early in the relationship of the parties. The Bankruptcy Court acknowledged that the creditors had previously, during the normal course of their business relationship, placed credit limits on debtor, establishing that new orders would not be shipped if the cost would exceed the credit limit. Such credit limits reasonably explained calls from the creditors and the necessity of prompt overnight payments. The Court of Appeals found that the evidence supported these findings and that the District Court's finding that the payments in question were made within the ordinary course of business established between the parties was not clearly erroneous. The Court of Appeals therefore affirmed both the District Court and the Bankruptcy Court on the § 547(c)(2)(B) issue.[11]

With regard to § 547(c)(2)(C), the Court of Appeals in *Global Tissue* noted, citing *In re Molded Acoustical Prods., Inc.*, 18 F.3d 217 (3d Cir.(Pa.), 1994), that some flexibility must be allowed regarding sources of evidence used to establish the range of practices that will be deemed the industry standard. The Court of Appeals then, quoting with approval from *In re*

---

[11] It is noted that the Bankruptcy Court determination was a finding of fact which was required to be upheld on appeal by the District Court and the Court of Appeals, unless found to be devoid of evidentiary support or to bear no rational relationship to the evidence in the record.

*Cherrydale Farms, Inc.*, 2001 Bankr. LEXIS 156 (Bankr.D.Del.), found that "testimony from employees of the parties involved in a preference payment dispute may be used to establish an industry standard, as long as the court determines that the employees are credible and have significant and relevant industry experience." *Global Tissue*, 106 Fed.Appx. at 103.

The vast majority of the payments during the preference period in the case at bar were made in advance of or simultaneous with shipment and invoice dates, or within the eight day period provided by the 1% 7 days, net 8 credit terms. UFP cites cases holding generally that any payment made within credit terms agreed upon between the parties is presumptively ordinary, or stated somewhat differently, is "deemed" within the ordinary course of business for purposes of § 547(c)(2). *See*, *In re Kiddy Toys, Inc.,* 178 B.R. 928 (Bankr.D.Puerto Rico, 1994); *In re Daedalean, Inc.*, 193 B.R. 204 (Bankr.D.Md., 1996); *In re Tennessee Valley Steel Corp.*, 201 B.R.927 (Bankr.E.D.Tenn., 1996). Based upon those cases, UFP urges this Court to find that all payments made by Hechinger within eight days of invoice date, i.e., within credit terms, are presumptively ordinary and "deemed" to be within a "safe harbor" for purposes of § 547(c)(2)(B).

The "safe harbor" doctrine, if applied as an absolute as UFP seems to suggest, would have the effect, for instance, of protecting transfers made within credit terms by a troubled debtor which historically made payments only well outside of such terms. Such payments would clearly prefer the creditor receiving them over other creditors who continued to receive payments beyond credit terms. As a result, this Court declines to blindly accept and automatically apply the suggested "safe harbor" doctrine to all payments made by Hechinger to UFP during the preference period within eight days of invoice date.

UFP, in its post-trial submission, entitled its "closing argument," makes much of the allegedly "bad public policy ramifications" of a determination urged by Hechinger that the transfers in this case were not "ordinary" because they were made faster than usual. UFP urges that such a determination would mean that credit terms could not be shortened on a customer in dire financial straits without ensuring that payments on such terms could be held to be preferential if the customer indeed seeks bankruptcy protection, and that such a result would cause sophisticated suppliers to either cease doing business with the customer or condition all new shipments on advance payment or COD terms. This result, UFP contends, would run counter to one of the purposes of the ordinary course exception, to encourage suppliers to continue dealing with such customers.

In *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir.(N.J.), 1989), the Court determined that the three subparts of § 547(c)(2) must be read in the conjunctive, and each proved by the party asserting the exception provided thereby. The Court noted that the legislative history of the provision briefly states that "'the purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'" *J. P. Fyfe,* 891 F.2d at 70 (quoting S. REP. NO. 989, 95th Cong., 2d Sess. 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5484, 5874). The Court in *Molded Acoustical* noted that such history provided "precious little assistance" in the interpretation of the provision. *Molded Acoustical,* 18 F.3d at 223.

The Court in *Molded Acoustical* was asked only to decide the meaning of the third element of § 547(c)(2), subpart (C). The opinion, however, contains an excellent, succinct

15

discussion of the concept of the preference statute in general and the ordinary course exception in particular, including the following statement:

> On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy. See H.R. REP. No. 595, 95th Cong., 21st Sess. 177-78 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6138; Union Bank v. Wolas, [502] U.S. [151], 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991).

*Id.*, at 219-220.

The evidence in the proceeding before this Court was that UFP very rarely imposed credit limits on large "Big Box" retailers such as Hechinger, that prior to February 1999 no such limit had ever been imposed upon Hechinger by UFP during the 15-year history of the relationship between the parties, and that UFP had taken that action on "Big Box" customers only twice before, in each case upon a customer which ultimately went into bankruptcy. In imposing the credit limit, and shortening the traditional payment terms, UFP was admittedly, and openly, attempting to limit its exposure to credit loss should Hechinger default, and at the same time to limit its exposure to preference liability should Hechinger ultimately wind up in bankruptcy.[12]

Considering all the facts and circumstances of this proceeding, including the substantial restrictive changes imposed by UFP on Hechinger immediately prior to what ultimately became

---

[12] This court does not credit Hechinger's contention that UFP's actions were in furtherance of a "nefarious plot," or that its actions were knowingly concealed from Hechinger for some devious or sinister purpose.

16

the preference period, after 15 years of association under vastly different conditions, this Court is compelled to conclude that the payments made by Hechinger to UFP during the preference period were not "made in the ordinary course of business or financial affairs of the debtor and the transferee," as that term is employed in § 547(c)(2)(B), and that therefore UFP has failed to sustain its burden under § 547(g) to establish that such payments have met the requirements of that subpart.

In making this determination, this Court is not holding that a supplier may do nothing to protect itself from losses in dealing with a customer whose financial fortunes are spiraling downward toward failure. What was done here, however, was so extreme, and so out of character with the long historical relationship between these parties, that it may only be characterized as preferential. The fact that Hechinger acquiesced in the substantial changes in the relationship does not alter the result, as the only reasonable alternative to such acquiescence was to go without treated lumber products, which were a substantial portion of its business, during the peak period for the sale of such products, the spring and early summer.[13]

Having concluded that Plaintiff must prevail due to UFP's failure to meet the requirements of the ordinary course of business exception contained in § 547(c)(2)(B), it is unnecessary to address the exception contained in § 547(c)(2)(C). This Court, however, feels compelled to find, and hold, that UFP has likewise failed to meet this prerequisite to obtaining the exception as well.

---

[13] It is noted that UFP must have benefitted from the continuation of the relationship in another particular as well. Hechinger was one of its largest customers for treated wood products, and UFP must therefore necessarily have amassed a substantial inventory of such products in anticipation of the substantial orders anticipated from Hechinger during what became the preference period. It is not at all clear whether UFP would have had a ready market for such products without Hechinger.

In *Molded Acoustical,* the Court, operating on what it described as a relatively clean slate, adopted the definition of "ordinary business terms" as that phrase is employed in § 547(c)(2)(C) which had been developed by Judge Posner of the Seventh Circuit in *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir.(Ill.), 1993):

> "[O]rdinary business terms" refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

In adopting the definition, the *Molded Acoustical* Court substituted the word "unusual" for "idiosyncratic." *Molded Acoustical,* 18 F.3d at 224.

The evidence offered by UFP in this case attempted to show that the § 547(c)(2)(C) definition was met. In this Court's view, it failed to do so. While the Court recognizes that Mr. Schumaker, an employee of the Defendant, is certainly competent and qualified to testify in this regard, the fact remains that the "normal" terms employed by UFP, one of the largest suppliers of treated lumber products in the country, with "Big Box" customers were without credit limits and, generally, with 30-day payment terms. The fact that UFP may have conducted business with its many customers on a wide variety of terms does not mean that any of such terms would have been "ordinary" between UFP and Hechinger.

Finally, UFP urges that the long duration of its relationship with Hechinger permits significant departure from "normal" or "ordinary" practices. The *Molded Acoustical* Court also adopted the following rule of construction to be employed in § 547(c)(2)(C) cases: "the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm

18

yet remain within the safe harbor of § 547(c)(2)." *Id.,* at 225.

It appears that UFP believes that this language somehow "normalizes" the extreme changes in the business relationship between it and Hechinger in February 1999. The language of the *Molded Acoustical* Court immediately following the rule of construction quoted above makes it clear that such is not the case:

> The likelihood of unfair overreaching by a creditor (to the disadvantage of other creditors) is reduced if the parties sustained the same relationship for a substantial time frame prior to the debtor's insolvency. After all, if at the starting point of the relationship insolvency was a distant prospect, a trade creditor does not unfairly overreach, impel insolvency, or inequitably advantage itself at other creditors' expense by tolerating more generous or commanding more stringent repayment schedules than its competitors. ... In short, we think that a trade debt payment made according to longstanding practice between two solvent parties most often does not "prefer" that creditor to the disadvantage of the debtor or other creditors.

*Id.*

It is clear in *Molded Acoustical*, that the Court intended to permit a creditor with a lengthy relationship with its customer to "vary its credit terms from the industry norm" over the life of the relationship, and not to permit eleventh hour changes of substantial magnitude when the positions of the parties is vastly different than when the relationship began.

This Court therefore finds and holds that UFP has failed to sustain its burden of proving, under § 547(c)(2)(C), that the transfers during the preference period at issue here were made according to "ordinary business terms."

## IV. CONCLUSION

Since UFP has failed to prove the nonavoidability of the transfers in question here under

either § 547(c)(1) or § 547 (c)(2), this Court finds and holds that judgment should be rendered in favor of Plaintiff and against Defendant in the amount of $1,004,216.03, the amount set out in the Amended Joint Pretrial Memorandum submitted by the parties. This Court, in its discretion, declines to award pre-judgment interest to Plaintiff. An appropriate Order follows.

Dated: June 16, 2005

PAUL B. LINDSEY
UNITED STATES BANKRUPTCY JUDGE