## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

In re

Hechinger Investment Company of
Delaware, Inc., et al.

         Debtor

———————————————————

Hechinger Investment Company
Of Delaware, Inc., et al., Debtors
In Possession,

Plaintiff(s),

vs.

Universal Forest Products, Inc.

         Defendant.

BK No. 99-02261-PJW
(Jointly Administered)

Chapter 11

Adv. No. 01-3170

**Civil Action Nos. 05-497 and 05-498 (KAJ)**

## APPELLANT'S BRIEF ON APPEAL

**DATED:  OCTOBER 24, 2005**

**MONZACK AND MONACO, P.A.**
Kevin M. Mangan (#3810)
1201 N. Orange Street, Suite 400
P.O. Box 2031
Wilmington, DE  19899
(302) 656-8162
kmangan@monlaw.com

and

**VARNUM RIDDERING SCHMIDT & HOWLETT LLP**
Michael S. McElwee (P36088)
333 Bridge Street, N.W., Suite 1700
Grand Rapids, MI  49504
(616) 336-6000
Attorneys for Defendants

## TABLE OF CONTENTS

INDEX OF AUTHORITIES............................................................................. iii

STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION........................vi

QUESTIONS PRESENTED.............................................................................vii

STANDARD OF REVIEW ON APPEAL........................................................ viii

STATEMENT OF THE CASE ...........................................................................1

STATEMENT OF FACTS ................................................................................2

    A.    The Parties........................................................................................2

    B.    Hechinger Was Historically a "Discount Purchaser. .........................2

    C.    Hechinger's Purchases From UFP Tended to be Seasonal, Spiking in
        the Spring and Early Summer..............................................................3

    D.    By Early 1999, Hechinger Was in Deep Financial Trouble................3

    E.    UFP Concluded That Unlimited Credit Sales to Hechinger on 30-Day
        Terms Were No Longer Prudent ..........................................................3

    F.    The Parties Agreed to Faster Payments and a Reduced Credit Limit ............4

    G.    The Parties Agreed That the Credit Limit Would Apply Both to
        Shipped Goods and Un-shipped Orders...............................................5

    H.    The Wire Transfers Were Split Between Payments in Advance and
        Payments on Antecedent Debt.............................................................6

    I.    Hechinger Knew that it Was Pre-paying for Orders .........................8

    J.    Hechinger Intentionally Destroyed its Paper Files, Including All Non-
        Electronic Documents Bearing on its "Intent" During the Preference
        Period.................................................................................................9

I.    THE TRANSFERS IN THIS CASE WERE CONTEMPORANEOUS
    EXCHANGES WITHIN THE MEANING OF §547(c)(1) ...........................9

    (a)    Hechinger's Remittance Advices Established "Intent" as a Matter of
        Law.................................................................................................10

    (b)    Hechinger's Payments Were Substantially Contemporaneous in Fact,
        Even if Some Portion of Them Were Applied on a Short-Term Credit
        Basis ...............................................................................................14

**II.** **THE TRANSFERS IN THIS CASE WERE MADE IN THE ORDINARY COURSE OF BUSINESS PER 11 U.S.C. § 547(c)(2)**.................................................... 19

    **(a)** **Payments Made Within Agreed Terms Are Presumptively Ordinary** .......... 20

        **(i)** *Applying the safe harbor in this case would not lead to the protection of stretched-out creditors in other cases* ................................. 22

        **(ii)** *Mr. Smith was not pressured to accept UFP's new terms* ....................... 22

        **(iii)** *The new terms were not out of character with past practice* ..................... 24

    **(b)** **The Trial Court's Ruling Undermines the Core Purpose of the Statute** ........ 24

    **(c)** **The Debtor's Payments Were According to Ordinary Business Terms** ........... 27

    **(d)** **The Small Percentage of Payments Hechinger Made Beyond Terms During the Preference Period Were Well Within Normal Historical Ranges, and thus Are also Protected by the OCB Defense** .............................. 29

**III.** **THE TRIAL COURT ERRED WHEN IT REFUSED TO GRANT RELIEF TO UFP ON ITS SPOLIATION MOTION** ................................................... 30

    **(a)** **The Trial Court Erred When it Refused to Apply Traditional Spoliation Remedies** ................................................................................... 31

        **(i)** *Hechinger had a duty to preserve its records* .......................................... 33

        **(ii)** *The prejudice suffered by UFP was high* ................................................. 34

        **(iii)** *An "adverse inference" would have been insufficient to remedy the prejudice caused to UFP, but the trial court refused even this minimal relief* ............................................................................................... 34

**CONCLUSION** ....................................................................................................... 36

## INDEX OF AUTHORITIES

**Cases**

*Anderson v. City of Bessemer,* 470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) .............14

*Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.),* 2005 U.S. App. LEXIS 13469 (5th Cir, July 7, 2005).........................................................................................19

*Barnhill v. Johnson,* 503 U.S. 393, 112 S. Ct. 1386, 118 L.Ed. 2d 39 1992................................27

*Big Wheel Holding Co. v. Federal Wholesale Co. (In re Big Wheel Holding Co.),* 233 Bankr. 669 (Bankr. Del. 1998)..............................................................................................................27

*CCG 1355, Inc. v. CRST, Inc. (In re CCG 1355, Inc.),* 276 Bankr. 377 (Bankr. N.J. 2002) .17, 19, 20

*Collins v. Throckmorton,* 425 A.2d 146 (1980) ...........................................................................36

*Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex, Inc.),* 349 F.3d 711 (3rd Cir. Del. 2003).......................................................................................................................... viii

*Equitable Trust Co. v. Gallagher,* 34 Del. Ch. 249, 102 A.2d 538 (Del. 1954)...........................33

*Ferrer v. Prusa Distribution Corp. (In re Kiddy Toys, Inc.),* 178 Bankr. 928 (Bankr. D. P.R. 1994)...............................................................................................................................20

*Fiber Lite Corp. v. Molded Acoustical Prods. (In re Molded Acoustical Products, Inc.),* 18 F.3d 217 (3rd Cir. 1994)..........................................................................................20, 27, 28

*Fire Insurance Exchange v. Zenith Radio Corp.,* 103 Nev. 648, 747 P.2d 911 (Nev. 1987)..34, 35

*Gatti v. CEBCO (In re Deliland Foods Corp.),* 2005 U.S. Dist. LEXIS 5258 (D. Del. March 31, 2005)...............................................................................................................................22

*Halverson v. Slater,* 129 F.3d 180 (D.C. Cir. 1997)....................................................................19

*In re Advance Glove Manufacturing Co.,* 42 Bankr. 489 (Bankr. E.D. Mich. 1984)....................10

*In re Carlisle Homes, Inc.,* 103 Bankr. 524 (Bankr. NJ 1988).......................................................24

*In re Chemical Separations Corp.,* 38 Bankr. 890 (Bankr. E.D. Tenn. 1984) ..............................10

*In re Cherrydale Farms, Inc,* 2001 W.L. 1820323 (Bankr. Del 2001)..............................................24

*In re Comer,* 716 F.2d 168 (3rd Cir. 1983) ................................................................................11

*In re Contempri Homes, Inc.,* 269 Bankr. 124 (Bankr. M.D. Pa. 2001)..................................10, 12

*In re Cornell & Company, Inc.,* 219 Bankr. 682 (Bankr. E.D. Penn. 1998) .................................11

*In re Craig Oil Co.,* 785 F.2d 1563, 1567 (11th Cir. 1986) ...........................................................21

*In re Fred Hawes Organization, Inc.,* 957 F.2d 239 (6th Cir. 1992) .............................................21

*In re Lease-A-Fleet, Inc.,* 141 Bankr. 63 (Dist. E.D. Pa. 1992) .....................................................11

*In re Lewellyn & Co,* 929 F.2d at 424 (8th Cir. 1991) ..........................................................16, 18

*In re Spada,* 903 F.2d 971 (3rd Cir. 1990) ...................................................................................10

*In re Tennessee Valley Steel Corp.,* 201 Bankr. 927 (Bankr. E.D. Tenn. 1996) ......................21, 29

*In re Tolona Pizza Products Corp.,* 3 F.3d 1029 (7th Cir. 1993).....................................................21

*In re Websco, Inc.,* 92 Bankr. 1 (Bankr. Me. 1988) .......................................................................21

*In re Wechsler,* 121 F. Supp. 2d 404 (D. Del. 2000).........................................................32, 33, 36

*Kool, Mann, Coffey & Co. v. Coffey,* 300 F.3d 340 (3rd Cir. 2002) ...............................................ix

*Luper v. Columbia Gas (In re Carled, Inc.),* 91 F.3d 811 (6th Cir. 1996) ....................................28

*Miller v. Florida Mining & Materials (In re A.W. & Associates, Inc.),* 196 Bankr. 900 (Bankr.
    N.D. Fla. 1996).......................................................................................................................27

*Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214 (1st Cir. 1982) .........32

*Peltz v. Hartford Life Insurance Co. (In re Bridge Information Systems),* 321 Bankr. 247 (Bankr.
    E. D. Mo. 2005).......................................................................................................................18

*Pine Top Insurance Co. v. Bank of America Nat'l Trust and Savings Ass'n,* 969 F.2d 321 (7th Cir.
    1992).......................................................................................................................................15

*Positran Manufacturing, Inc. v. Diebold, Inc.,* 2003 WL 21104954 (D. Del. 2003)..............33, 34

*Schmid v. Milwaukee Electric Tool Corp.,* 13 F.3d 76 (3rd Cir. 1994)....................................32, 33

*Scroggins v. BP Exploration & Oil (In re Brown Transport Truckload, Inc.),* 161 Bankr. 735
    (Bankr. N.D. Ga. 1993) ..........................................................................................................27

*Shepherd v. American Broadcasting Co.,* 62 F.3d 1469, 1479 (D.C. Cir. 1995) ..........................35

*Silverman Consulting, Inc. v. Canfor Wood Products Marketing (In re Payless Cashways, Inc.),*
    306 Bankr. 243, 248 (BAP 8th Cir. 2004), *aff'd,* 394 F.3d 1082 (8th Cir. 2005).10, 15, 16,
    19, 20

*Trinkoff v. Porters Supply Co. (In re Daedalean, Inc.),* 193 Bankr. 204 (Bankr. D. Md. 1996) ..21

*Troisio v. E.B. Eddy Forest Products Ltd. (In re Global Tissue, LLC),* 302 Bankr. 808 (D.C. Del.

2003), *aff'd*, 106 Fed. Appx 99, 2004 U.S. App. LEXIS 1403 (3rd Cir. 2004) ..........26, 27

*Unites States v. United States Gypsum Co.,* 333 U.S. 364, 68 S. Ct. 525, 92 L.Ed. 746 (1948)....ix

*Wm. T. Thompson Co. v. General Nutrition Corp.*, 593  F. Supp. 1443 (C.D. Cal. 1984) .....34, 36

## Statutes

11 U.S.C. §547(b)........................................................................................................................20

11 U.S.C. § 547(c)(1), (2) and (3) ...............................................................................................1

11 U.S.C. §547(c)(1) ..................................................................................................................11

11 U.S.C. §547(c)(2)(A) through (C)…………………………………………………………21

28 U.S.C. §158(a)…………………………………………………………………………..vi

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

This is an appeal from a final judgment of the United States Bankruptcy Court for the District of Delaware (Wilmington Division). Appellate jurisdiction therefore lies with this Court per 28 U.S.C. 158(a).

## QUESTIONS PRESENTED

1.      Are payments made by a bankruptcy debtor within a few hours or days after shipment "substantially contemporaneous" so as to fall within the "contemporaneous exchange for new value" defense under 11 U.S.C. §547(c)(1)?

2.      When a customer falls into deep financial trouble, can a supplier shorten the due date for future shipments to the customer, and reduce the customer's credit limit, without creating the risk that payments for new goods will become "unordinary" and thus transformed into avoidable preferences?

3.      Can a debtor in bankruptcy intentionally destroy relevant evidence, but avoid the spoliation rules that apply to other litigants?

## STANDARD OF REVIEW ON APPEAL.

In an appeal from a judgment of a bankruptcy court, the District Court reviews questions of law on a *de novo* standard, and questions fact on a "clearly erroneous" standard. Bankruptcy Rule 8013. A finding is "clearly erroneous" only when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Unites States v. United States Gypsum Co.,* 333 U.S. 364, 68 S. Ct. 525, 92 L.Ed. 746 (1948). See, also, *Kool, Mann, Coffee & Co. v. Coffey,* 300 F.3d 340 (3rd Cir. 2002) ("A finding of fact is clearly erroneous when it had no credible evidence to support it or when it has no rational relationship to the evidence").

With regard to questions of law, the District Court is not bound by the "clearly erroneous" standard, but instead may substitute its own judgment and review the trial court's conclusions *de novo.* See, e.g., *Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex, Inc.),* 349 F.3d 711 (3rd Cir. Del. 2003).

## STATEMENT OF THE CASE

This is a "preference" case under 11 U.S.C. §547. During the 90 days prior to its bankruptcy filing (the "preference period"), the Debtor ("Hechinger") paid Universal Forest Products, Inc.("UFP") $16,500,516.94. UFP, in turn, sent thousands of shipments to Hechinger totaling a like amount. Hechinger's payments for UFP's goods were made within a few hours or days before or after shipment, or exactly on the date of shipment itself. The result was an average DSO ("Days Sales Outstanding") during the preference period of zero.

Hechinger sued UFP to recover these payments on a preference theory. UFP asserted three defenses: the "contemporaneous exchange" defense under §547(c)(1), the "ordinary course of business" ("OCB") defense under §547(c)(2), and the "subsequent new value" defense under §547(c)(4). The trial court held that the payments UFP received were protected by neither the "contemporaneous exchange" nor the "ordinary course of business" defenses, and therefore awarded Hechinger a judgment of $1,004,216.03 (the 90-day transfers, minus payments in advance and "subsequent new value" under §547(c)(4)).

Several months after its bankruptcy filing, Hechinger destroyed all of its UFP related files, which contained potentially key evidence relating to Hechinger's intentions at the time the underlying transactions were occurring. After destroying these records, Hechinger raised "lack of intent" in response to UFP's (c)(1) defense. UFP filed a spoliation motion seeking at a minimum an adverse inference on the intent issue. The trial court denied this motion without opinion, and then at trial drew inferences on the intent issue in Hechinger's favor.

UFP therefore takes this appeal from the trial court's post-trial opinion and judgment, and its order denying UFP's spoliation motion.

1

## STATEMENT OF FACTS

### A.    The Parties.

Before it was liquidated, Hechinger operated a chain of do-it-yourself ("DIY") stores known as "Builders Square" and "Hechinger's." DIY stores are the world's largest retail sellers of treated wood products. TT 42.[1] Hechinger was one of the major "players" in the DIY arena, but could not compete with better managed companies like Home Depot, Lowe's, and others.

UFP is the world's leading manufacturer and wholesaler of treated wood products. TT 27. UFP had a long term relationship with Hechinger spanning over fifteen years. TT 29.

### B.    Hechinger was Historically a "Discount Purchaser."

Like most DIY companies, Hechinger acquired goods from its larger vendors, including UFP, on discount terms. Terms of this type allow a high-volume purchaser to earn a discount in exchange for faster payments. The historical terms UFP extended to Hechinger were "1% 10/net 30," which meant Hechinger could earn a 1% price reduction for invoices paid within ten days. TT 34, 43. For payments made by mail, UFP allowed a seven-day grace period (a "mail float"), which made mailed payments received within 17 days of shipment discount eligible. TT 35.

For many years, including the three years prior to its bankruptcy filing, Hechinger paid the vast majority of UFP's invoices on a fast-pay basis, within discount terms. D62. In 1997, 93% of Hechinger's payments to UFP were within 17 days or less. This ratio was 87% in 1998, and over 90% in 1999. D62.[2] Hechinger paid nearly $10,000,000 to UFP in 1998 (the year

---

[1] "TT" refers to the Trial Transcript, which has been made part of the record on appeal. The record also includes the exhibits marked by the parties (Hechinger Exhibits P1 through P56; UFP Exhibits D1 through D63), which were received into evidence *en masse* on the day of trial. See, TT 6-7, 58-59. These exhibits include many of deposition transcripts generated during the discover phase of this case. The Joint Pre-trial Memorandum ("JPM") and certain motion papers have also been included in the record.

[2] Prompt-payment discounts were common in the marketplace in 1999, and remain so today. TT 38. Most of Hechinger's other major vendors also sold to the company on a fast-pay basis, with discounts ranging from 1% to 2%. D54.

before bankruptcy) even faster, within 10 days of shipment or less. *Id.*

Because Hechinger's receivables were paid so quickly, UFP tended to have no credit exposure to Hechinger during periods of slow sales activity, and only short-term exposure during the busy season. TT 174-75. In February of 1999 (shortly before the preference period started), UFP's account with Hechinger was paid in full, if not over-paid. D36.

**C.    Hechinger's Purchases From UFP Tended to be Seasonal, Spiking in the Spring and Early Summer.**

In many markets where Hechinger did business, treated wood sales were seasonal in nature, spiking during the outdoor building season (the spring and early summer). TT 42. As a result, the vast majority of Hechinger's purchases from UFP tended to occur in the spring. D62.

This peak sales season corresponded roughly with what turned out to be the 90-day preference period, which for Hechinger started on March 13, 1999 and ended on June 11, 1999. While it was impossible for UFP to know back in early 1999 when or whether the preference period would start, it did know that it was entering the riskiest part of the sales season. D29.

**D.    By Early 1999, Hechinger Was in Deep Financial Trouble.**

Hechinger was in shaky financial condition for many years, which worsened in 1999. UFP monitored Hechinger's financial condition closely, as did many other vendors. TT 147. Shortly before Hechinger filed for bankruptcy protection, all of its vendors were "on hold" (i.e., they were refusing new shipments to Hechinger), except UFP and Georgia Pacific. D2 and D58. UFP was able to continue new shipments only by negotiating new terms-of-sale with Hechinger.

**E.    UFP Concluded That Unlimited Credit Sales to Hechinger on 30-Day Terms Were no Longer Prudent.**

By February of 1999, Hechinger's financial condition had deteriorated so significantly that UFP could no longer risk unlimited credit sales on 30-day terms, especially during the looming high-volume season. TT 44. On February 4, 1999, Jim Ward of UFP sent a letter on

this subject to Mark Adams, Hechinger's CFO. P29. In the letter, Mr. Ward listed several "options" for future business between the parties. These options, numbered 1 through 4 in Mr. Ward's letter, were as follows:

(1)    You can provide a guaranty from the Leonard Green organization. Under this scenario we would either sell you on open account or at a limit equal to the amount of the guaranty, if the guaranty is for a specific amount.

(2)    You can provide us with a letter of credit to secure our open accounts receivable balance. Under this scenario, we would set a credit limit equal to the amount of the L/C.

(3)    We can convert the account to Cash in Advance. Under this scenario you would wire transfer funds to us weekly and we would release orders up to that amount.

(4)    We can establish a credit limit which will be constantly reviewed and reduced if we see further decline in your financial position or continue to have problems getting information from you. We would initially set this limit at $500,000, with payment terms of 1% 10 days, net 11.

P29.

## F.    The Parties Agreed to Faster Payments and a Reduced Credit Limit.

After Mr. Ward's letter was sent to Hechinger, Beth Nickel (UFP's chief financial officer)[3] spoke about it with Mr. Clifford Smith (Hechinger's chief restructuring officer). Mr. Smith told Ms. Nickel that option 4 was the only one he would consider. P7 at 25.

Mr. Smith and Ms. Nickel later met in person and agreed to option 4, with certain modifications. Hechinger's credit limit was set at $1,000,000, rather than $500,000 as proposed by Mr. Ward. P34. The terms of payment for future shipments were changed to "1% 7, net 8," as opposed to Mr. Ward's proposal of "1% 10, net 11." P34; TT 61.

---

[3] At the time this letter was sent, Ms. Nickel's last name was "Bowman."

Given the anticipated high level of sales during the approaching peak sales season – these sales ultimately averaged $260,000 per day during the preference period – the parties understood that Hechinger would "bump up" against its credit limit often, and would therefore be able to keep new goods flowing only if it made rapid payments to UFP in cash or by wire transfer.  TT 150-51.  At the meeting between Ms. Nickel and Mr. Smith, this point was discussed at length. TT 55-56, 151-52.  Ms. Nickel confirmed this in a letter to Mr. Smith three days after their meeting:

> We expect there will be times that we will bump up against the credit limit.  You have committed to sending us wire transfers and/or paying in advance of the seven day terms in order to keep our exposure at or below the $1,000,000 level.  Brian Schumaker or I will call you when we are seeing scheduled shipments that will put us over the limit.

P34.  Mr. Smith told Ms. Nickel that these arrangements were "fine" and that he would "give [them] a shot."  P7 at 25.  See, also, P7 at 42-43 (where Mr. Smith testified that he agreed in particular to the credit limit UFP proposed).

### G.   The Parties Agreed That the Credit Limit Would Apply Both to Shipped Goods and to Un-shipped Orders.

Ms. Nickel explained to Mr. Smith that the new credit limit would apply both to goods that had been shipped, and also to un-shipped orders.  TT at 58, 152.  The credit limit was designed this way to assure that when goods left UFP's facilities, the value of the goods, plus any outstanding invoices, would not put Hechinger over the agreed credit limit.  TT 45.  Applying credit limits in this fashion was a long-standing practice at UFP.  TT 47.  UFP followed it with all of its customers (not just Hechinger).  TT 50.  Similar practices were (and still are) uniformly followed across American commerce.  TT at 47, 155-57.

After the new terms were in place, UFP monitored Hechinger's account on a daily, even hourly, basis. TT 34, 54-56. UFP's computer system sent a warning or "flag" to UFP's credit manager whenever the combination of Hechinger's invoices and orders approached the credit limit. TT 48-51.

PREFERENCE PERIOD PAYMENT LOG

| Date | Wire Amount | Credit Limit | Advance Amount |
|---|---|---|---|
| 3/15 | $ 500,000 | $ 500,000 | |
| 3/19 | $ 500,000 | $ 500,000 | |
| 3/25 | $ 500,000 | $ 500,000 | |
| 3/29 | $ 500,000 | $ 500,000 | |
| 3/31 | $ 500,000 | $ 500,000 | |
| 4/2 | $ 500,000 | $ 500,000 | |
| 4/6 | $ 500,000 | $ 500,000 | |
| 4/12 | $ 500,000 | $1,000,000 | |
| 4/14 | $ 500,000 | $1,000,000 | |
| 4/15 | $ 500,000 | $1,000,000 | |
| 4/16 | $1,000,000 | $1,000,000 | |
| 4/19 | $1,000,000 | $1,000,000 | |
| 4/21 | $1,000,000 | $1,000,000 | |
| 4/26 | $1,000,000 | $1,000,000 | |
| 4/30 | $1,000,000 | $1,000,000 | |
| 5/4 | $1,000,000 | $1,000,000 | |
| 5/12 | $1,000,000 | $1,000,000 | |
| 5/1 | $1,000,000 | $1,000,000 | |
| 5/20 | $1,000,000 | $1,000,000 | |
| 5/23 | $1,000,000 | $1,000,000 | |
| 5/28 | $1,000,000 | $1,000,000 | |
| 6/4 | $1,000,000 | $1,000,000 | |

EXHIBIT
D 60

When this occurred, UFP called Hechinger to request wire transfers. TT 63-64. There were a total of 22 such requests, and therefore 22 wire transfers, during the preference period, which means that wires were occurring on average every 2.9 business days. D60 (see sidebar). UFP always requested wires in amounts that corresponded exactly to the then-existing credit limit. TT 64; D60.[4]

### H.    The Wire Transfers were Split Between Payments in Advance and Payments on Antecedent Debt.

Since the wire transfers were made in the amount of the credit limit, and since the credit limit applied both to shipments and unshipped orders, the wires were necessarily split between payments in advance and payments on antecedent debt. TT 70; D60. The fact that Hechinger's payments would be split this way was obvious from the very nature of the parties' arrangement,

---

[4] There were four or five days in early April, after the credit limit was increased from $500,000 to $1,000,000 (it had been moved to $500,000 in early March), when Hechinger continued to send wires of only $500,000, notwithstanding UFP's requests for larger amounts. This, however, was quickly remedied. Mr. Smith called to apologize for sending the wrong amounts, and instructed his staff to increase the wires to $1,000,000 each. D65 (middle of first page). From April 14 onward, the wire transfers were all in the larger amount of $1,000,000. D60.

6

and was openly discussed by Ms. Nickel and Mr. Smith not only when the new credit terms were

arranged, but also frequently at the time the sales transactions were occurring. TT 69-70, 154-

55, 159. Indeed, Hechinger often insisted on sending wires even earlier than UFP requested,

before existing orders and invoices were near the credit limit, because it wanted to "build a bank"

and thus assure that very large anticipated orders would be shipped immediately when they hit

UFP's system. TT 69, 155.

Given the fact that these payments were made prior to shipment, the parties' accounting

practices were forced to change after the new terms-of-sale were imposed. Before the new

terms-of-sale, it was Hechinger's practice to pay by check, which it typically sent with a

corresponding remittance advice. TT 70. These remittance advices listed invoices that all pre-

dated Hechinger's payments. *Id.*

When the wire transfers were sent by Hechinger to UFP during the preference period,

however, there were not yet enough shipments, and therefore not enough invoices, to offset

them. TT 71. Hechinger therefore had to wait for more goods to be shipped, and thus for more

invoices to "hit the system," before it could create remittance advices and send them to UFP. *Id.*

("They were waiting for our invoices to get into their system"). Hechinger's accounting clerk

described this process as waiting for invoices to "flood in against the wires." P9 at 24-25. When

Hechinger accumulated enough invoices, only then did it send remittance advices to UFP, using

in part invoices for goods that shipped **after** the wire transfers had been sent. TT 80-81.[5]

---

[5] The process was described in D35, a document from Hechinger's accounts payable department ("[UFP] was prepaid for orders written. The invoices for these prepayments were not yet sufficient to offset at 5/29. Advances are put onto the account with a future date so that purchase orders relative to the advances can be identified and moved to offset the advance").

Hechinger's payments during the preference period were, as a result, bunched in a narrow range between ten days in advance and eight days antecedent (i.e., from ten days before shipment to eight days after shipment), with the greatest concentration of payments occurring on the date of shipment itself.  A bar graph showing this was introduced into evidence as D61



(see sidebar).  D61 is, in fact, a graphic depiction of the manner in which Hechinger itself instructed UFP to apply the wire transfers (i.e., it is a graphic display of Hechinger's own remittance advices). TT 82.[6]  All of the remittance decisions made during the preference period (as shown on D61) were made solely by Hechinger. TT76.

## I.    Hechinger Knew it was Pre-paying for Orders.

Since Hechinger's employees applied the wire transfers to shipments that occurred after the funds were wired, they knew (indeed, they had to know) they were pre-paying for orders. They often indicated as much in internal accounting documents:

> (a)    "We are wiring $500,000 to Universal Forest today, March 15, **to cover orders ready for shipment.**" D10.

> (b)    "Please wire $1,000,000 to Universal Forest today **for orders.**" D22.

---

[6] On the basis that its own accounting data was used to prepare this exhibit, Hechinger stipulated to its admissibility. TT at 82.

(c)    "Please wire $1,000,000 to Universal Forest today, April 26. **Orders are sitting at $850,000 this morning.**" D23.

Hechinger's personnel also repeatedly described the wire transfers to UFP as "advance payments." See, e.g., D11 through D14. By the end of the preference period, Hechinger's personnel had remitted $8,956,181.02 to UFP in advance, for unshipped orders. JPM, ¶¶ 17 through 19. Hechinger remitted another $7,077,108.26 within 8 days (or less) after shipment. See, D61.[7]

**J.    Hechinger Intentionally Destroyed its Paper Files, Including all Non-electronic Documents Bearing on its "Intent" During the Preference Period.**

In late 1999 and early 2000, the Debtor destroyed literally all of its paper files, including those related to UFP. The only documents not destroyed were those stored electronically, which were primarily accounting records such as D57 and the remittance advices. All of the notes, memos, letters, messages or other documents collected by Hechinger's personnel who dealt directly with UFP on a regular basis, and who were most deeply involved with UFP immediately before and during the preference period, were lost. The papers that could have been used to demonstrate the real time thoughts, impressions and intentions of Hechinger's personnel no longer exist and were thus unavailable at trial.

## ARGUMENT

**I.    THE TRANSFERS IN THIS CASE WERE CONTEMPORANEOUS EXCHANGES WITHIN THE MEANING OF §547(c)(1) .**

Under §547(c)(1), preferential transfers are not recoverable when the transferee extends "new value" to the debtor in exchange for the transfers, provided that the transfers and the payments are "substantially contemporaneous" and intended by the parties to be "substantially

---

[7] Pre-paying for inventory was a routine part of Hechinger's business. TT 230-31. It pre-paid numerous vendors, only one of which was UFP. D57; TT at 228. Hechinger tracked the level of its pre-payments to UFP and other vendors on a daily basis during the preference period. D57.

contemporaneous."[8]  The purpose of this defense is to **"protect transactions that do not diminish the bankruptcy estate."**  *See, In re Spada,* 903 F.2d 971 (3rd Cir. 1990).  The key element of this defense is intent, i.e., both parties must intend to exchange goods for payments on a "substantially contemporaneous" basis.  903 F.2d at 975.

The trial court held that Hechinger intended all of its payments during the preference period to be "on credit" (i.e., to be payments on antecedent debt), and that Hechinger did not knowingly or intentionally pay even a single dollar to UFP in advance.  The trial court further held that payments intended as credit transactions can never be contemporaneous exchanges.  The trial court's conclusions are flawed, both legally and factually..

### (a)    Hechinger's Remittance Advices Established "Intent" as a Matter of Law.

Since intent under (c)(1) is rarely admitted by the debtor, it must typically be proved with circumstantial evidence.  *Silverman Consulting, Inc. v. Canfor Wood Products Marketing (In re Payless Cashways, Inc.),* 306 Bankr. 243, 248 (BAP 8th Cir. 2004), *aff'd,* 394 F.3d 1082 (8th Cir. 2005).  The circumstantial evidence to which the courts look first is the manner in which the buyer instructed the seller to apply the payments (i.e., they look first to the buyer's remittance advices).  *In re Contempri Homes, Inc.,* 269 Bankr. 124 (Bankr. M.D. Pa. 2001).  They do so for the simple reason that a buyer cannot deny the intent manifest in its own remittance instructions. *In re Chemical Separations Corp.,* 38 Bankr. 890 (Bankr. E.D. Tenn. 1984) (application of wire transfers to recent invoices establishes the "intent" factor of the (c)(1) defense); *In re Advance Glove Manufacturing Co.,* 42 Bankr. 489 (Bankr. E.D. Mich. 1984)(the books and records of the

---

[8]  11 U.S.C. §547(c)(1)("The trustee may not avoid under this section a transfer (1) to the extent that such transfer was (A) intended by the debtor and the creditor . . . to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange").

parties identifying "a particular payment with a particular invoice" are determinative with respect to the parties' intent).[9]

Hechinger's remittance instructions to UFP were clear, detailed, and covered **every single dollar** Hechinger paid to UFP during the preference period.[10]  UFP, for its part, followed Hechinger's remittance instructions without exception. TT 81. Since Hechinger (**not** UFP – TT 76) hand-picked each preference period shipment for payment, and did so knowing both the dates of the shipments and the dates of the wire transfers (TT 77), it is scientifically impossible for Hechinger not to have known about and not to have intended the timing of its preference period payments.

Nevertheless, Hechinger was "adamant in its assertion" that it "believed" its payments were always on credit, and never for orders or in advance.  Opinion p. 9-10.  Based on the adamant nature of these assertions, the trial court concluded that "[W]hile UFP contends that its frequent phone calls had requested that Hechinger to pay for unshipped orders, the record supports Hechinger's argument that such calls merely alerted Hechinger to the fact that orders could not be shipped unless and until Hechinger remitted funds to reduce its outstanding debt . . .." Opinion p. 11. Neither the record nor the law, however, supports such a conclusion.

The point of *Contempri Homes* and the other cases cited above is that a buyer simply cannot refute the intent manifest in its own remittance instructions, no mater how intensely it may want to do so. Hechinger cannot not change the fact that its personnel knowingly chose and

---

[9] These holdings are premised on the absolute right of a buyer to direct the application of its payments. *In re Comer*, 716 F.2d 168 (3rd Cir. 1983); *In re Lease-A-Fleet, Inc.*, 141 Bankr. 63 (Dist. E.D. Pa. 1992), *aff'd*, 983 F.2d 1051 (3rd Cir. 1992); *In re Cornell & Company, Inc.*, 219 Bankr. 682 (Bankr. E.D. Penn. 1998); *Restatement (Second) of Contracts* §258 (1981); *Williston on Contracts* §72:2 (2003).

[10] Hechinger's remittance advices were marked as Exhibits D37 through D49. They balance the preference period shipments and payments to the penny.

executed every single payment that occurred during the preference period, and did so knowing the dates of the shipments and the dates of all corresponding payments. Once Hechinger stipulated to the authenticity and admissibility of its remittance advices, the intent issue was therefore closed.[11]

The trial court's conclusion that the "record supports" Hechinger's assertion that it never intended to pay for unshipped orders is contradicted, however, by more than just the remittance advices. All of the documentary evidence in the record bearing on this issue – literally all of it – shows that Hechinger knew it was pre-paying for UFP's goods, including millions of dollars of unshipped orders:

> (a)    UFP told Hechinger that the credit limit would apply to both invoices and orders, TT58, 152, which UFP confirmed in writing. P34 (wires will apply to **"scheduled shipments"**).

> (b)    Applying credit limits in this fashion is a standard business practice. TT 47, 155-57; P34

> (c)    Hechinger's staff acknowledged in writing that the wire transfers were for **orders**. D10 ("We are wiring $500,000 to Universal Forest today, March 15, **to cover orders ready for shipment**").

> (d)    "Please wire $1,000,000 to Universal Forest today **for orders**". D22.

> (e)    "Please wire $1,000,000 to Universal Forest today, April 26. **Orders are sitting at $850,000 this morning**". D23.

> (f)    **"[UFP] was pre-paid for orders written."** D35.

---

[11] Hechinger's stipulation to the accuracy of D61, and to the fact that it remitted nearly $9,000,000 in advance, cannot be reconciled with its "no intent" argument, a point the trial court appeared to acknowledge when it wrote, "[T]he parties have stipulated and agreed that during the preference period, advance payments in the amount of almost $9,000,000 were made by Hechinger to UFP. The fact that Hechinger contends that it was not aware of this, nor did it intend to be, paying for goods in advance, does not change the stipulation or the result." Opinion p. 11. The issue, however, was not whether Hechinger's argument changed its stipulations (surely, it did not), but whether the stipulations changed or ought to have changed Hechinger's argument. In the face of its stipulation that it paid thousands of individual shipments in advance during the preference period, amounting in the end (as the court noted) to almost $9,000,000, a sophisticated commercial entity like Hechinger simply cannot credibly assert that it acted without intent.

(g)    Hechinger's accounting staff over-and-over described the wires sent to UFP as "advance payments." See, D11 (**"WIRE ADVANCE PMT ON 3/19/99"**).

(h)    D12 ("WIRE **ADVANCED PAYMENT**").

(i)    D13 ("DEDUCT **ADVANCE WIRE** PAYMENT 3/29/99").

(j)    D14 ("**ADVANCE PAYMENT** BY WIRE 4/6/99")

(k)    D19 ("WIRE **ADVANCED PAYMENT** 4/15").

(l)    D25 ("**ADVANCE WIRE** OFFSET 5/4/99").

(m)    D26 ("OFFSET **ADVANCE WIRE PMT** 5/12/99").

(n)    D27 ("OFFSET **ADVANCE WIRE** 5/17/99").

(o)    D29 ("**ADVANCE** VIA **WIRE** OFFSET").

(p)    Hechinger's standard practice was to "**occasionally prepay some of its inventory.**" D57.

(q)    Hechinger tracked the level of its pre-payments to UFP during the preference period on a daily basis. D57.

It is impossible, in the face of the remittance advices and this additional documentary evidence, and in light of the "preponderance of evidence" standard, to conclude that Hechinger "always believed" its payments to UFP were only credit payments.

The trial court was correct that Mr. Smith testified that Hechinger "didn't do cash advance with **any** vendors" and was "**completely averse**" to cash in advance." TT at 214, 218. But Mr. Smith's oral testimony was the only evidence Hechinger offered on this issue.[12]   And when confronted with D57, the very first line of which says, **"Hechinger Investment Company occasionally prepays some of its inventory,"** Mr. Smith capitulated. He openly conceded that Hechinger not only knew it paid UFP in advance, but also knew exactly what the level of those

---

[12] Hechinger did not produce as witnesses any of the personnel who wrote the memos and remittance documents cited above.

13

pre-payments were. *Id.* Mr. Smith eventually conceded, even, that pre-payments were part of

the "normal course of business" at Hechinger, which could not have more directly contradicted

his direct testimony. TT 230-31.

While the trial court has the prerogative to resolve conflicts in the competing evidence

offered by the parties, where the documentary or other extrinsic evidence points to only one

conclusion, and the witness' testimony is at best inconsistent, it is clear error for the court to

make findings of fact contrary to the documentary evidence. *Anderson v. City of Bessemer,* 470

U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985):

> [T]he trial judge may not insulate his findings from review by
> denominating them credibility determinations, for factors other than demeanor
> and inflection go into the decision whether or not to believe a witness.
> Documents or objective evidence may contradict the witness' story; or the story
> itself may be so internally inconsistent or implausible on its face that a reasonable
> fact finder could not credit it. Where such factors are present, the court of appeals
> may well find clear error even in a finding purportedly based on a credibility
> determination. [citation omitted]

470 U.S. at 575. The court's finding that Hechinger intended only "credit sales" was therefore an

obvious mistake.

The legal errors in the court's holding, however, are even more fundamental than the

factual ones. Building on the false conclusion that Hechinger intended only credit sales, the court

held that credit sales **never** qualify as contemporaneous exchanges under (c)(1). Opinion at 11.

For the reasons explained below, this conclusion is predicated on a misreading of the language,

and misapprehension of the policy objectives, of the Code.

### (b)    The Code Requires "Substantially Contemporaneous" Payments, not "Absolutely Contemporaneous" Ones.

The trial court's holding is predicated on the notion that "contemporaniety" is a rigid or

absolute concept, rather than a flexible one. The statute, however, requires only "substantial"

contemporaniety. "The modifier 'substantial' makes clear that contemporaniety is a flexible

concept." *Pine Top Insurance Co. v. Bank of America Nat'l Trust and Savings Ass'n*, 969 F.2d 321 (7th Cir. 1992). Numerous cases have held that, given the flexibility built into the statute, short-term credit sales are precisely the kinds of transactions (c)(1) was intended to protect, particularly when the parties negotiated the shorter terms to offset the risk of credit sales to a customer in known financial trouble.

In *Silverman Consulting, Inc. v. Canfor Wood Products (In re Payless Cashways, Inc.)*, 306 Bankr. 243 (BAP 8th Cir. 2004), *aff'd*, 394 F.3d 1082 (8th Cir. 2005), the debtor owned and operated a large chain of DIY stores, just as Hechinger did.[13]  Its wood supplier became concerned about the debtor's financial health and thus about the risk of future credit sales, so the parties met to negotiate new terms to mitigate that risk. 306 Bankr. at 246. They agreed to future payments by wire transfer ("EFT"), and to fast-pay terms of "1% 2, net 3" for truck shipments and "1% 11, net 12" for rail shipments.  *Id.*  These terms were designed to "substantially reduce the risk of non-payment" and to "match up the actual delivery of lumber with Payless' obligation to wire transfer payments."  *Id.*  The parties agreed to these terms on January 24, approximate 5 months before the preference period stared on June 4. The debtor's payments ultimately occurred between 1 to 15 days after shipment, but on average close to the date of delivery.[14]

The *Silverman* BAP held that the parties' short-term credit agreement, which was designed to mitigate the seller's credit risk by assuring that the debtor's payments would occur on average when its debts to the seller arose, was a contemporaneous exchange agreement, and that

---

[13] Payless and Hechinger are two of the largest casualties in the fiercely competitive DIY arena.

[14] These facts are virtually identical to the facts in the present case. The parties (a DIY chain and a wood seller), the circumstances (new shorter terms-of-sale), the method of payment (wire transfers), the motivation (to offset the risk of non-payment) and the timing (new terms negotiated on the eve of the preference period), are all practically the same.

payments made within the terms of this agreement were protected under (c)(1), even if some portion of them were applied to short-term antecedent debt. "A transaction can be substantially contemporaneous even if some temporal separation exists between the new value provided and the payment received." 306 Bankr. 251. Quoting *Tyler v. Swiss American Securities, Inc. (In re Lewellyn & Co.)*, 929 F.2d 424 (8th Cir. 1991) (discussed below), the court also held, **"Section 547(c)(1) applies whether the new value is given before or after the transfer by the debtor; the statute requires only that the transfer be 'substantially' contemporaneous."** *Id.*

The *Silverman* court rejected the debtor's argument that the vendor's agreement to extend credit terms to the debtor showed an "intent" to engage only in credit transactions. 306 Bankr. 249. The court rejected as false the dichotomy between "credit transactions" and "contemporaneous exchanges," holding that the debtor's assertion that it intended only credit transactions was both untrue factually and irrelevant legally. The court of appeals affirmed, noting that the BAP's decision was so strong that further comment could not improve upon it. 394 F.3d at 1083 ("Silverman appeals contending that the parties intended the transactions to be credit transactions. Silverman also contends no contemporaneous exchange occurred . . . The BAP has written a comprehensive, well-reasoned opinion [rejecting these arguments]. . . , with which we agree.").

In *CCG 1355, Inc. v. CRST, Inc. (In re CCG 1355, Inc.)*, 276 Bankr. 377 (Bankr. N.J. 2002), the court likewise held that rushed payments for current or recent shipments are contemporaneous exchanges, particularly when such payments are made to offset the seller's risk of non-payment. In *CCG*, the creditor was informed by the debtor that it was about to be sold, and that the debtor's ability to make payments for new shipping services would therefore soon cease. The debtor needed critical shipments to be transported, however, so it promised to rush its payments to the creditor (a shipping company). 276 Bankr. at 380. The payments were

16

eventually made, however, between 7 and 11 days **after** the shipment dates and 3 to 6 days **after** the delivery dates, but **before** CCG could prepare and send invoices to the debtor. *Id.* The court held that rushed payments of this type, being as they were for "new shipping services," were "clearly" contemporaneous exchanges, **even though paid on a short-term credit basis**:

> While there is up to a 12 day lag between the shipment dates (i.e., the dates that goods were first picked up from CCG for later delivery to its customers), and payment, these payments were clearly intended to be contemporaneous with the new shipping services. §547(c)(1)(A). In fact, payments were made promptly, in both trucking industry terms and per the course of dealing of CCG and CRST. But were they "substantially" contemporaneous with the services rendered? §547(c)(1)(B). While the five subject shipments were all initiated and delivered somewhat before the March 23 payment, invoicing actually post-dated payment. *See,* APP. 2. Drawing on the lesson of *Dean v. Davis,* 242 U.S. 438, 37 S. Ct. 130, 61 L. Ed. 419 (1917), and considering the immediate commercial context, the court finds these rushed deliveries and [payments] to be substantially contemporaneous.

276 Bankr. at 385-86.

In *In re Lewellyn, supra,* the Court held that an agreement to settle margin calls within 7 days was a contemporaneous exchange agreement and that payments made within the agreed 7-day period were "substantially" contemporaneous. The court so held even though all of the payments were "on credit." 929 F.2d at 428.

Similarly, in *Peltz v. Hartford Life Insurance Co. (In re Bridge Information Systems),* 321 Bankr. 247 (Bankr. E. D. Mo. 2005), the court held that wire transfers by the debtor to its insurance company to reimburse the insurance company for benefit payments on the debtor's behalf in the prior week, were substantially contemporaneous exchanges and therefore protected under (c)(1), even though all of the payments were applied to antecedent debt and were thus credit transactions. This case, like the others cited above, hinged on the fact that the parties expressly agreed to rushed payments by wire transfer to satisfy short-term credit obligations:

> Because the statute only requires that the exchange be substantially contemporaneous with the creditor's provision of new

17

> value, the determination of whether the exchange was in fact contemporaneous is a flexible one. *Lindquist v. Dorholt (In re Dorholt),* 224 F.3d 871 (8th Cir 2000). Also, the creditor transferee may provide the new value **either before or after the debtor remits the preferential transfer.** [citation omitted]. Further, the analysis should not only include the examination of the proximity in time between when the debtor remitted the challenged transfer and when the creditor provided the new value, but also whether the exchange occurred within the time frame established by the parties' agreement. *Lewellyn,* 929 F.2d at 428.

321 Bankr. at 256 (emphasis added). The court in *Peltz* determined that, since the wire transfers were sent by the debtor to Hartford within 7 days after Hartford paid short-term disability payments on the debtor's behalf, the payments were "in fact substantially contemporaneous within Bridge's remission of the wire transfers." *Id.* [15]

The trial court in the present case, however, neither mentioned nor cited any of these authorities. Instead, the court concluded, as indicated, that Hechinger "intended" only credit sales (i.e., not payments for unshipped orders), and further concluded that payments on credit can **never** be contemporaneous exchanges (even, apparently, if made mere moments after shipment). This conclusion cannot be reconciled with the authorities cited above. It also embodies a basic logical flaw that better reasoned cases like *Silverman* and *CCG* do not.

A preference cannot arise in the first place unless there is a payment on antecedent debt, i.e., unless a credit transaction is involved. See, 11 U.S.C. §547(b)(2)(preferences are payments "for or on account of an antecedent debt"). If the trial court were correct that the (c)(1) defense never applies to credit transactions, then the (c)(1) defense would never apply to transactions that qualify as preferences. Congress intended (c)(1) to apply, however, to transfers that are *prima*

---

[15] See, also, *In re Anderson-Smith & Associates, Inc,* 188 Bankr. 679, 689 (Bankr. N. D. Ala. 1995)("A transaction can be substantially contemporaneous even where there is some separation between the events of the extension of new value and the transfer by the debtor. The court finds that the exchange between the parties was functionally simultaneous despite [a] nine day delay . . .").

*facie* preferences, and thus by necessity to payments on antecedent debt. The trial court's conclusion to the contrary is illogical, as it converts the (c)(1) defense into a statutory nullity. This violates the most basic rule a statutory construction: "In the construction of statutes, the courts start with the assumption that the legislature intended to enact an effective law, and that the legislature is not to be presumed to have done a vain or futile thing in the enactment of a statute." 73 Am. Jur. 2d, *Statutes,* §164 (2001). See, also, *Halverson v. Slater,* 129 F.3d 180, 185 (D.C. Cir. 1997) (citing the "familiar doctrine that Congress cannot be presumed to do a futile thing").[16]

Accordingly, UFP urges this Court to hold that *Silverman, CCG* and the other cases cited above are more in keeping with the language and intent of §547(c)(1), that all payments made by Hechinger within the parties' agreed 8-day terms were contemporaneous exchanges, and that UFP's liability therefore cannot exceed $265,099. PTM at ¶18.

## II.    THE TRANSFERS IN THIS CASE WERE MADE IN THE ORDINARY COURSE OF BUSINESS PER 11 U.S.C. § 547(c)(2).

Under §547(c)(2)(A) through (C), a preferential transfer is not recoverable when the transfer (1) was "in payment of a debt incurred in the ordinary course of business," (2) was "made in the ordinary course of business" and (3) was "made according to ordinary business terms." **The ordinary course of business defense serves primarily the purpose of encouraging creditors to continue doing business with struggling debtors.** *Fiber Lite Corp. v. Molded Acoustical Prods. (In re Molded Acoustical Products, Inc.),* 18 F.3d 217, 219 (3rd Cir. 1994).[17]

---

[16] The trial court's ruling renders the (c)(1) defense futile, because it improperly conflates the "antecedent debt" requirement in (b)(2) with the "substantially contemporaneous" requirement in (c)(1). See, *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.),* 2005 U.S. App. LEXIS 13469 (5th Cir. July 7, 2005) (the "antecedent debt" requirement and the "contemporaneous exchange" requirement are "two analytically separate inquiries" and that it is error to "conflate" the two).

[17] "The ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy."

**(a)    Payments Made Within Agreed Terms Are Presumptively Ordinary.**

The payments UFP received within 1-8 days of shipment were within the parties' newly agreed terms and were therefore presumptively ordinary. For purposes of adjudicating the "ordinariness" of payments, the courts apply the general rule (often referred to as the "safe harbor" or "current expense" rule) that payments made within agreed terms are presumptively ordinary. "Payments made with the time allotted by the contract provision between the debtor and creditor best exemplifies normal business relations." *Ferrer v. Prusa Distribution Corp. (In re Kiddy Toys, Inc.),* 178 Bankr. 928 (Bankr. D. P.R. 1994). "Where a payment is made within the time established by a creditor's invoice, the transfer is deemed within the ordinary course of business." *Trinkoff v. Porters Supply Co. (In re Daedalean, Inc.),* 193 Bankr. 204 (Bankr. D. Md. 1996).[18]

The trial court correctly found that the vast majority of the payments by Hechinger to UFP occurred well within agreed terms. Opinion p. 14 ("The vast majority of the payments during the preference period in the case at bar were made in advance of or simultaneous with shipment and invoice dates, or within the eight day period provided by the 1% 7 days, net 8 credit terms"). They were also well within the parties' historical 1% 10, net 30 terms.

The trial court, however, refused to hold that the payments were presumptively ordinary. It based its decision on the fact that, even though Hechinger paid UFP within agreed terms, it did

---

[18] Given the purpose of the preference rules and the (c)(2) defense, the great bulk of litigation over the (c)(2) defense has involved payments made beyond the terms established between the debtor and the creditor, not early or current payments. See, e.g., *In re Tolona Pizza Products Corp.,* 3 F.3d 1029 (7th Cir. 1993) (Posner, J.)(holding that the preference rules typically apply only to late payments); *In re Fred Hawes Organization, Inc.,* 957 F.2d 239, 244 (6th Cir. 1992) (". . . **late** payment of a debt has been considered particularly important in determining whether the payment was ordinary"); *In re Craig Oil Co.,* 785 F.2d 1563, 1567 (11th Cir. 1986)("**Lateness** is particularly relevant in determining whether payment should be protected by the ordinary course of business exception."); *In re Websco, Inc.,* 92 Bankr. 1, 3 (Bankr. Maine 1988)("**Late** payments, in and of themselves, indicate a trade relationship that is most often out of the ordinary; that is, not the normal financial relations the legislative history speaks to").

so at the far front end of such terms (i.e., very early within such terms). Opinion at 14. This holding misconceives and misapplies the safe harbor doctrine.

The presumption of ordinariness arises for payments within terms regardless of whether the payments are made on the first day or the last day of the agreed terms, or anywhere in between. "Section 547(c)(2)(B) cannot be used to reduce or modify the terms of an agreement between a debtor and transferee merely because the debtor varies the timing of its payments so long as those payments are made in a manner consistent with the terms of the parties' agreement." *In re Tennessee Valley Steel Corp.*, 201 Bankr. 927, 936 (Bankr. E.D. Tenn. 1996). "[P]ayments made within the contractual terms agreed upon by the parties are ordinary and meet the §547(c)(2) (B) component, **notwithstanding that the customer's payments may vary within the terms of the parties' agreement.**" 201 Bankr. at 936. "[A] creditor with a customer whose account is to be paid within thirty days of the date an invoice is issued but who historically pays its account in fifteen days of the invoice date will still be able to avail itself of the ordinary course of business defense if the customer pays a single invoice within the preference period on the last day the payment is due, i.e., the 30th day." 201 Bankr. at 936.

Following similar reasoning, this court held in *Gatti v. CEBCO (In re Deliland Foods Corp.)*, 2005 U.S. Dist. LEXIS 5258 (D. Del. March 31, 2005) (Hon. K. Jordan) that payments by check within 7 days of shipment, replaced by wire transfers 7 days later (after the checks bounced), were protected by the OCB defense. This court in *Deliland* did so even though the 7-day payment terms were imposed by the seller after learning of the debtor's poor financial condition, and even though the resulting payments were made in response to so-called collection pressure. This court's holding in *Deliland* endorses the notion that faster payments fall within the safe harbor and thus within OCB defense.

The trial court nevertheless refused to follow the logic of the "safe harbor" cases on the

grounds that UFP's argument was too "absolute," which the trial court declined to "blindly accept and automatically apply." Opinion, p. 14. The court articulated three reasons for its refusal. First, the safe harbor if applied in other cases might protect preferred creditors. Second, Hechinger did not really "agree" to the new terms in February of 1999, because "the only reasonable alternative to such acquiescence was to go without treated lumber products . . . . during the peak [sales] period." Third, the new terms between the parties were "so extreme and out of character with the long historical relationship between the parties, that [they] may only be characterized as preferential." None of these reasons justifies the court's decision.

### (i)    *Applying the safe harbor in this case would not lead to the protection of stretched-out creditors in other cases.*

The trial court suggested that the safe harbor doctrine, if applied "absolutely," would have the effect of protecting "transfers made within credit terms by a troubled debtor which historically made payments only well outside of terms. Such payments would clearly prefer the creditor receiving them over creditors who continued to receive payments beyond credit terms." Opinion, p. 14. This rationale, however, is not implicated on the facts of the present case.

But for a small percentage of disputed invoices (which are normal in any complex commercial relationship), UFP was fully paid before the preference period started. D36. There was therefore no old debt for Hechinger to stretch out. Also, Hechinger historically paid 90% or more of UFP's invoices within 17 days or less, and often even faster. D62. The payments over time between the parties were thus not "well outside of contract terms," but well inside them. It is therefore hard to imagine a case where the trial court's concern over the possibility of preferring a stretched-out creditor is more remote than it is here.

### (ii)    *Mr. Smith was not pressured to accept UFP's new terms.*

With respect to the trial court's assertion that Hechinger had no option but to accept UFP's new terms, the exact opposite is in fact the case. Mr. Smith testified that he told Beth

Nickel he would "cut your legs off right now, and you're done" if she did not agree to the terms Mr. Smith preferred. P7 at 18. He also told her that, if he did not get his way, UFP would "go bye-bye" and was "done" as a Hechinger vendor. P7 at 19 and 57. He testified that the sales force at Hechinger had arranged "four or five other vendors" to outsource treated wood (P7 at 19 and 68), and therefore "could take business away from [UFP]." P7 at 19 and 68-69. These new vendors gave Hechinger "flexibility with regard to purchase decisions" which made Hechinger "less dependant on UFP." P7 at 68. When asked why he even bothered to stay with UFP, given the abundant options otherwise available to him, Mr. Smith responded only that his sales people liked UFP's products. P7 at 25.

Mr. Smith did, however, suggest for the first time at trial that he was forced to accept UFP's terms, due to a lack of alternate supply sources. TT 231. On cross-examination, though, Mr. Smith conceded that his earlier testimony was to the contrary. To explain the inconsistency, he said only that the 4 or 5 other suppliers his staff had lined up, and who gave Mr. Smith the "flexibility . . to take business away from UFP," "didn't work out." TT 233. His earlier testimony, however, was closer in time to the events in question, and he never indicated during his earlier testimony that the freedom about which he bragged was mitigated in any way.

As indicated earlier, the trial court has the prerogative to resolve conflicts in the competing evidence offered by each of the parties. *Infra* at 17-18. A party cannot, however, create an issue of fact merely by having its witness contradict his own earlier sworn testimony. *Martin v. Merrill Dow Pharmaceuticals, Inc.*, 851 F.2d 703 (3rd. Cir. 1998)(sworn affidavits that flatly contradict earlier sworn testimony must be disregarded); *In re Carlisle Homes, Inc.*, 103 Bankr. 524 (Bankr. NJ 1988) (same holding in a bankruptcy context).

### (iii)    *The new terms were not out of character with past practice.*

There was no evidence that the new terms were "extreme and . . . [radically] out of character with the long and historical relationship between the parties." Opinion p. 14. To the contrary, Hechinger was always a "fast pay" customer. It chose to "fast pay" UFP 93% of the time in 1997, 87% in 1998 and over 90% in 1999. D62. In 1998, the Debtor paid nearly $10,000,000 to UFP within 10 days of shipment or less. *Id.*

Before the preference period started, UFP did indeed shorten the prompt-payment discounts from 10 days to 7 days. This change, although not "rigidly similar" to past practices, was not wildly out of character with past dealings. *In re Cherrydale Farms, Inc,* 2001 W.L. 1820323 (Bankr. Del 2001)( "rigid similarity" not required).

Moreover, during the peak season in past years, the Debtor agreed to even shorter terms. In June of 1998, for example, the parties agreed to 5 day terms. D5. Also in June of 1998, the Debtor sent checks (including one for $1,433,880) to UFP via priority overnight delivery. P4 at 181-186; D7 and D8. The evidence therefore suggested that the 1999 arrangements between the parties were quite similar to their arrangements in earlier years. The court's failure to consider this admitted (and uncontradicted) evidence was clearly erroneous.[19]

### (b)    The Trial Court's Ruling Undermines the Core Purpose of the Statute.

By rejecting the safe harbor doctrine, the trial court's holding threatens to drive vendors away from customers in financial distress, and thus to undermine the core purpose of the OCB defense. The court's holding will teach vendors that, if they shorten terms or impose a credit limit on customers in financial distress, even if such changes are applied to **new** purchases only,

---

[19] The trial court noted in foot note 7 of its opinion that these 1998 arrangements were "not mentioned at trial," which apparently means the court did not take this evidence into consideration. However, there were many exhibits admitted by stipulation that the parties did not have time to mention. The stipulation to admit the exhibits *en masse* was in fact motivated by the time limitations the parties faced.

the payments they receive will be transformed *ipso facto* into preferences. Sophisticated vendors, however, will not continue selling to high-risk customers on open credit and 30-day terms. If they can't change terms to off-set the risk, they will either abandon the customer or condition new shipments on strict COD terms. Any flexibility afforded by terms in the middle will be destroyed. There is nothing in the language or the purpose of the bankruptcy statute that mandates this illogical result; such a result is in fact counter the very purpose of the (c)(2) defense.

The trial court acknowledged that some flexibility to change terms is necessary to fulfill the purpose of the statute, but criticized UFP's changes as "extreme." The court, however, offered no explanation of why a vendor's willingness to extend terms for new goods **ever** merits this criticism. UFP was under no obligation to sell new goods to Hechinger at all, so any terms it offered were a net benefit to the estate and should have been encouraged, not punished. UFP's new terms made possible over $16 million in additional shipments during the preference period, which Hechinger quickly converted to cash at retail. COD terms, although safe from preference attack, would have been only marginally faster, but practically unworkable.[20] There is no foundation in the language or purpose of the Code for forcing these less flexible and more difficult terms on debtors and their vendors.

The Third Circuit has recently held that the result urged by Hechinger and adopted by the trial court is not required by the language or the purpose of the preference statute. *Troisio v. E.B. Eddy Forest Products Ltd. (In re Global Tissue, LLC)*, 302 Bankr. 808 (D.C. Del. 2003), *aff'd*, 106 Fed. Appx. 99, 2004 U.S. App. LEXIS 1403 (3rd Cir. 2004). In *Global Tissue*, the trustee

---

[20] UFP sent thousands of truck-loads to Hechinger during the preference period, which averaged dozens (sometimes even hundreds) of shipments per day. Strict COD terms would have been enormously difficult in this setting, if not logistically impossible.

argued, as Hechinger argues here, that the defendant placed a credit limit on the debtor's account shortly before the preference period started, which had the effect of forcing the debtor to make faster payments "to guarantee a continued supply of indispensable wood pulp." 106 Fed. Appx. at 101. After placing a credit limit on the debtor's account, the "creditor applied pressure on Global Tissue to make . . . payments, as reflected by phone calls from the creditor requesting payment. In response, . . . one of the payments was sent by overnight courier." 106 Fed. Appx. at 102. The debtor even made three rapid payments in close succession (one week apart) which, according to the trustee, were accelerated from the ordinary course of dealing between the parties. *Id.*

The Third Circuit rejected the trustee's argument that the OCB defense was destroyed by the changes the creditor imposed. It held that the imposition of a credit limit did not destroy the OCB defense, and that the communications needed to assure compliance with new credit limit, for new shipments, were not "collection efforts" within the meaning of § 547(c)(2). 106 Fed. Appx. at 103.

The holding in *Global Tissue* is consistent with the widely-accepted proposition that a seller, even one who permits credit terms, is under no legal obligation to sell new goods to the debtor on credit, and therefore does not destroy the OCB defense by refusing credit sales or by holding orders. *See, e.g., Big Wheel Holding Co. v. Federal Wholesale Co. (In re Big Wheel Holding Co.)*, 223 Bankr. 669 (Bankr. Del. 1998):

> The *Molded Acoustical Products* case does not require Federal East to continue to do business with the debtor after receiving ordinary course payments from the debtor to avail itself of the affirmative defense of Section 547(c)(2). The committee has not cited any case law that supports its legal theory. The theory would effectively engraft a fourth and conjunctive requirement under Section 547(c)(2), that the ordinary course exception to the preference rule is available only where the creditor "continues dealing with a distressed debtor so as to rekindle its chances of survival without a costly tour through bankruptcy." The court declines to create such a requirement.

26

223 Bankr. at 674-75. *See, also, Scroggins v. BP Exploration & Oil (In re Brown Transport Truckload, Inc.),* 161 Bankr. 735 (Bankr. N.D. Ga. 1993) (where the court held that a reduction in a credit limit from $400,000 to $100,000 did not destroy the OCB defense).

Establishing shorter terms with a customer also does not destroy the OCB defense. *Miller v. Florida Mining & Materials (In re A.W. & Associates, Inc.),* 196 Bankr. 900 (Bankr. N.D. Fla. 1996) (quoting, *Barnhill v. Johnson,* 503 U.S. 393, 112 S. Ct. 1386, 118 L.Ed. 2d 39 (1992)). The trustee in the *Miller* case argued that a creditor who changed the debtor's terms from "2% 10th, net 30" to "due 10th of the following month" destroyed the OCB defense. The Court rejected this argument, finding that "the new terms did not deviate from the ordinary course of business between the parties." 196 Bankr. at 904. The Court observed that the vendor continued to ship goods to the debtor in reliance of these new payment terms, which the Court held was consistent with the Supreme Court's formulation of the purpose of the OCB defense, i.e., to encourage creditors to accept payments within historical terms without fear that the payments will be disgorged as a preference. *Id.*

(c)    **The Debtor's Payments Were According to Ordinary Business Terms.**

The payments by the Debtor to UFP during the preference period were objectively ordinary. When there is a long-term relationship between the creditor and the debtor, §547(c)(2)(C) requires the creditor to prove only that the terms to which the parties agreed were not "so idiosyncratic as to fall outside" the broad range of terms generally observed by "firms similar in some way" to the creditor:

> "[O]rdinary business terms refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, **and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.**" *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1033 (7th Cir. 1993) (emphasis in original). We will embellish the Seventh Circuit test, however, with a rule that

27

> subsection C countenances a greater departure from that range of terms the longer the pre-insolvency relationship between the debtor and creditor was solidified.

*In re Molded Acoustical Products,* 18 F.3d at 220.  The issue in *Molded Acoustical* was whether late-payments are so unusual as to fall outside the "so idiosyncratic" standard.

This issue does not even arise, however, if the payments were made timely:

> The most distinguishing characteristic between *[Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.),* 91 F.3d 811 (6th Cir. 1996), the Sixth Circuit case following *Molded Acoustical Products]* and the present adversary proceeding is that in *Carled* the Debtor's payments were late . . . .  In the present case, payments were not late . . . .  Each of the invoices [in this case] was paid timely by the Debtor . . . .  **This would seem to negate the need for the "industry standard" analysis as the court presumes that timely payments are the required norm within the natural gas industry.**

*Tennessee Valley Steel Corp.,* 201 Bankr. at 938 (emphasis added).

The trial court nevertheless held that UFP failed to meet the "industry standard" test, because it failed to demonstrate that terms of 1% 7, net 8, and restricted credit limits, were common with "big box" stores.  Opinion at 14.  By formulating the question this way, the trial court placed upon UFP the burden of proving that it is "objectively ordinary" to receive payments within standard industry terms (i.e., within 1-30 days).  But as the court in *Tennessee Valley Steel* correctly held, such payments are always "objectively ordinary" because the 1-30 day terms are themselves the industry standard.

Accordingly, UFP urges this Court to hold that all payments made by Hechinger to UFP within terms during the preference period were OCB payments within the meaning of 11 U.S.C. § 547(c)(2), and that UFP's liability therefore cannot exceed $265,099.

(d)    **The Small Percentage of Payments Hechinger Made Beyond Terms During the Preference Period Were Well Within Normal Historical Ranges, and thus Are Also Protected by the OCB Defense.**

Throughout the course of the parties' relations, Hechinger always paid a small ratio of UFP's invoices beyond terms. Exhibit D62 shows that Hechinger paid 1.91% and 4.81% of UFP's invoices beyond 30 days in 1997 and 1998 respectively. Hechinger paid 85% and 69% of invoices in 11-30 days in those years respectively. The payments between 10 and 30 days, and the small percentage of payments beyond 30 days, were therefore perfectly routine and ordinary.

During the preference period, Hechinger likewise made a small percentage of its payments from 10-30 days, and an even smaller percentage beyond 30 days. D61. Of the $16,500,516.94 paid by Hechinger to UFP during the preference period, $467,227.64, or 2.8%, was paid beyond 8 days. *Id.* That percentage, and the amounts that make up that percentage, are well within historical norms.

These payments are protected by the OCB defense because they are either within the traditional 30-days terms observed by the parties, or if beyond those terms, they are well within the small percentage of late payments that naturally occur in the course of such complex commercial relations. *See, In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993). Hechinger was in a uniquely poor position to contest this point at trial, as its argument all along was that payments to UFP would have been ordinary if they had only been made a bit slower. The trial court, too, rejected UFP's ordinary course of business defense on the grounds that it received payments too quickly, from which one would have logically concluded that the payments it received more slowly would have been safe. Yet, the trial court did not address or analyze the payments received by UFP between 8 and 30 days, or beyond 30 days.

UFP therefore urges this court to conclude that the payments received by UFP from Hechinger in the range to 8-30 days, and beyond 30 days, are within normal historical

percentages, are protected by the OCB defense, and that Hechinger therefore has no cause of action against UFP in any amount.[21]

## IV.    THE TRIAL COURT ERRED WHEN IT REFUSED TO GRANT RELIEF TO UFP ON ITS SPOLIATION MOTION.

In the motion papers UFP filed with the trial court in connection with its spoliation motion, it set forth in detail its efforts to obtain documents from Hechinger during discovery, Hechinger's failure to produce the documents UFP requested, and then UFP's efforts to learn why these documents were missing and not produced.[22]  In the end, UFP ultimately learned that there was a "clean out" process at Hechinger in the late fall of 1999, after the company converted from an operating to a liquidating entity.  Through this "clean out" process, literally every paper file in Hechinger's archives was destroyed.  Contract documents, e-mails, correspondence, memos, and all the "vendor files," including all of the files relating to UFP, were lost as a result.

Mr. Smith admitted that all of Hechinger's paper files were intentionally destroyed, with no effort to preserve evidence that may have been needed in future preference cases:

> Q:    Do you, Cliff, have any records that you kept while you were at Hechinger?  Do you still have any of them, or have access?
>
> A:    No.
>
> Q:    You left everything at the company?
>
> A:    Oh, yeah.
>
> Q:    When the company went through this document clean-out process that you have described, were you called and was your counsel sought about whether your files should be kept or discarded?

---

[21] As shown on Exhibit 61, payments made beyond 8 days by Hechinger during the preference period were $467,227.64.  The parties nevertheless agreed that if payments between 0 and 8 days fall within either the (c)(1) or (c)(2) defenses, UFP's maximum liability falls to $265,099.  These two figures do not match, because the smaller one is net of the (c)(4) defense.

[22] UFP's motion and brief, Hechinger's response, and UFP's reply, have all been designated as part of the record on appeal.

A:    **I think we just sort of got rid of everything.  We really didn't even think about it.**

*    *    *

Q:    Did you make any effort yourself to save or preserve any of the files, any of your vendor files at all?

A:    We just took everything that was in the computer as far as you know what was there, and we saved that.  **I didn't save anything in the office**.

P7, at 36-38 (emphasis added).  When asked about files relating specifically to UFP, Mr. Smith admitted that those too "went away:"

There was a Universal Forest Products file, but I guess when we went through the, you know, clean out to move out of the building, it must have . . . went away.

P7, at 36.

After learning of this destruction, UFP filed a spoliation motion with the trial court. The basic point raised by UFP was the unfairness inherent in what Hechinger had done.  As the proponent of the (c)(1) defense, UFP had the burden of proof on the "intent" issue, but Hechinger had destroyed precisely the kind of documents one would typically use to demonstrate an opponent's intent -- the documents written by the opponent itself at the time the events in issue were occurring.  These documents would have demonstrated the real-time thoughts and impressions of Hechinger's personnel when they were ordering goods from, and making payments to, UFP.  After destroying the documents, Hechinger denied the requisite intent, and then challenged UFP to prove otherwise.

(a)    **The Trial Court Erred When it Refused to Apply Traditional Spoliation Remedies.**

Since the 17th Century, courts have imposed a "spoliation inference" and other more serious remedies against those who destroy or "spoil" potentially relevant evidence.  *Schmid v.*

31

*Milwaukee Electric Tool Corp.*, 13 F.3d 76 (3rd Cir. 1994). "The . . . rationale for the inference is nothing more than the common sense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy [it] is more likely to have been threatened by the evidence than the party in the same position who does not destroy the evidence." *Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1st Cir. 1982) (citing *Schmid, supra*).

Remedies for "spoliation" are triggered whenever a party has reason to anticipate litigation, or when litigation has already been filed, but the party proceeds to destroy potentially relevant evidence anyway. *In re Wechsler*, 121 F. Supp. 2d 404, 414 (D. Del. 2000). Parties to existing or anticipated litigation have an affirmative duty to preserve evidence that "might" be relevant to the issues in the lawsuit. *Id.*

A party who breaches this duty by destroying evidence, or allowing evidence to be destroyed, is subject to a variety of possible sanctions. 121 F. Supp. 2d 415. The Third Circuit has established three factors that must be considered when determining the type of sanctions to impose:

(1)    The degree of fault and personal responsibility of the party who destroyed the evidence;

(2)    The degree of prejudice suffered by other parties; and

(3)    The availability of a lesser sanction that would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the same type of conduct in the future.

*See, Schmid*, 13 F.3d at 79. *See, also, Positran Manufacturing, Inc. v. Diebold, Inc.*, 2003 WL 21104954 (D. Del. 2003).

When deciding what sanction to impose, the courts focus particularly on whether the evidence was destroyed accidentally or inadvertently, in which case a lesser sanction is appropriate, as opposed to willfully and intentionally, in which case a more severe sanction is

appropriate. *In re Wechsler*, 121 F. Supp. 2d at 415. The severest of sanctions, the outright dismissal of the spoliator's claims, is typically imposed when, as in the present case, evidence is destroyed intentionally with knowledge of actual or anticipated litigation. When evidence is destroyed inadvertently and unintentionally, the courts typically resort to the lesser sanction of presuming that the documents so destroyed would, if they existed, be adverse to the despoiler. *Id.*; *Equitable Trust Co. v. Gallagher*, 34 Del. Ch. 249; 102 A.2d 538, 541 (Del. 1954).

When presented with these authorities, the trial court refused any relief to UFP, and did so without opinion or analysis. It is therefore impossible to determine why the court refused even the "lesser sanction" of applying an adverse interest against Hechinger.

>    (i)    *Hechinger had a duty to preserve its records.*

It cannot be disputed that Hechinger had a duty to preserve its records. As a debtor-in-possession in a bankruptcy proceeding, such a duty was imposed upon Hechinger by the Bankruptcy Code. 11 U.S.C. § 541 (which defines property of the bankruptcy estate). The documents were nevertheless destroyed without any apparent attempt by the Debtor to seek or obtain an order from the bankruptcy court authorizing the destruction.

Also, Hechinger destroyed its records **after** filing for bankruptcy protection, and thus **after** its Chapter 5 claims (including its preference claims) arose under the Code. Hechinger destroyed the records even after it closed its operations and converted to a liquidating debtor, and thus after its eventual pursuit of preference claims was all but assured. Hechinger knew or should have known at the time that its records were relevant and discoverable, and therefore had a duty to preserve them. *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443 (C.D. Cal. 1984).

### (ii)    *The prejudice suffered by UFP was high.*

Whether a non-spoliator is prejudiced by the destruction of documents or other evidence depends on whether the information destroyed is recoverable from other sources. *Fire Insurance Exchange v. Zenith Radio Corp.*, 103 Nev. 648, 747 P.2d 911 (Nev. 1987). *See, also, Positran Manufacturing, Inc. v. Diebold, Inc.*, *supra*. The documents Hechinger destroyed cannot now be resurrected or retrieved. D 63, at 54-56 (where a Hechinger representative answered "None that I know of" in response to a question about whether any means existed to recover the documents Hechinger destroyed). This is, therefore, a high prejudice case.

### (iii)    *An "adverse inference" would have been insufficient to remedy the prejudice caused to UFP, but the trial court refused even this minimal relief.*

Whether to award only an adverse inference, a more serious sanction, depends on whether an adverse inference is sufficient to right the wrong. Where it is not, only more severe sanctions will suffice:

> The actions of Fire Insurance Exchange [who destroyed the allegedly defective product] had the effect of reserving to itself all expert testimony based upon examination of the television set. **Any adverse presumption which the court might have ordered as a sanction for the spoliation of evidence would have paled next to the testimony of the expert witness.** The statement of Fire Insurance Exchange revealed that it was on notice of potential litigation prior to the destruction of the television set and [it] had the power to preserve the remains of the television set. The fact that the complaint was not filed by the Fire Insurance Exchange until two years after the fire should not be held against the respondent.

*Fire Insurance Exchange v. Zenith Radio Corp.*, 747 P.2d 911 (Nev. 1987). The point of this holding is that, where evidence is lost irrevocably, after only one of the parties had an opportunity to inspect the evidence, a mere adverse interest is insufficient to remedy the harm caused by the spoliation because the evidence itself may have been more favorable to the nonspoiler than the adverse inference.

34

For this reason, the most severe of all sanctions – outright dismissal of the Plaintiff's claims – generally arises where the destroyed documents are or may be dispositive of the case and where the despoiler has engaged in such a wholesale destruction of evidence that the court cannot fashion an effective issue-related sanction. *Shepherd v. American Broadcasting Co.*, 62 F.3d 1469, 1479 (D.C. Cir. 1995). In the present case, both of these factors are fully operative. The destroyed evidence may well have exposed Hechinger's "no intent" argument to be utterly meritless, particularly if that evidence (like the electronically-preserved evidence Hechinger did not destroy) showed that Hechinger and its personnel knew perfectly well that they were making payments in advance and contemporaneous payments to UFP. In other words, the evidence may have completely eviscerated Hechinger's "no intent" argument, and may have done so in a way that an "adverse inference" could never duplicate.

The scope of the document destruction by Hechinger also militates in favor of a much more severe sanction. The document destruction by Hechinger was so broad, undertaken on such a wholesale level, that there literally is no reported decision involving a document destruction campaign that is more comprehensive. Literally every physical file Hechinger possessed was destroyed – literally every one. The only appropriate remedy, therefore, was dismissal. In *Wm. P. Thompson, supra*, 593 F. Supp. at 1443 ("[Defendant's] destruction of critical documents deprived [plaintiff] of access to the objective evidence it needed to build its case against [defendant]. Default and dismissal are proper sanctions in view of [defendant's] willful destruction of documents and records that deprived [plaintiff] of the opportunity to present critical evidence on its key claims to the jury"). *Id.* at 1455-56.

Other courts faced with the loss of documentary evidence have also held that the use of a standard spoliation inference can be of no value where the evidence goes to an issue on which the moving party has the burden of proof, because the inference itself does not constitute

substantive evidence sufficient to satisfy that burden. *See, e.g., Collins v. Throckmorton*, 425 A.2d 146, 150 (Del. 1980) ("This inference does not amount to substantive proof and cannot take the place of proof of a fact necessary to the [parties'] case"). The United States District Court for the District of Delaware granted a default judgment to the moving party for the same reason, noting that the spoliation inference cannot serve as a substitute for actual evidence, and that an adverse inference sanction had no punitive or deterrent value. *In re Wechsler*, 121 F. Supp. 2d at 428.

Because UFP bore the burden of proof with regard to its affirmative defenses, including proof of intent to make contemporaneous exchanges, the standard spoliation inference would have been an insufficient remedy. Yet, the trial court refused even this minimal relief. Worse, even after UFP went through the painstaking process of combing through reams of irrelevant printouts from Hechinger's electronic archives, finding at long last documents like D57 that contradicted Hechinger's denials of intent, the trial court ignored this evidence and drew inferences on the intent issue in Hechinger's favor. This was a profoundly unfair thing for the court to do.

The spoliation rules apply in bankruptcy, just as they do in other Federal Courts. The fact that a debtor would destroy so many documents, all while the debtor prepared to sue thousands of vendors on preference theories, should have inspired a close look by the court at the inequitable consequences inherent in such behavior. The trial court's failure to give this issue any individualized attention was wrong, highly prejudicial to UFP (and others), and should be remedied on appeal.

## CONCLUSION

For all of these reasons, UFP prays for a ruling (1) that the trial court's denial of UFP spoliation motion was in error, and (2) reversing the trial court's post trial opinion and judgment,

36

and remanding this case with instructions to enter a judgment of no cause of action in UFP's favor.

Respectfully submitted:

**MONZACK AND MONACO, P.A.**

Dated: October 24, 2005        By: _____

Kevin M. Mangan (#3810)
1201 N. Orange Street, Suite 400
P.O. Box 2031
Wilmington, DE  19899
(302) 656-8162
kmangan@monlaw.com

and

**VARNUM RIDDERING SCHMIDT & HOWLETT LLP**
Michael S. McElwee (P36088)
333 Bridge Street, N.W., Suite 1700
Grand Rapids, MI  49504
(616) 336-6000
Attorneys for Defendants

48534

37

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | BK No. 99-02261-PJW<br>(Jointly Administered) |
| Hechinger Investment Company of<br>Delaware, Inc., et al. | |
| Debtor | Chapter 11 |
| ──────────────────────── | Adv. No. 01-3170 |
| Hechinger Investment Company<br>Of Delaware, Inc., et al., Debtors<br>In Possession, | Civil Action Nos. 05-497 and 05-498 (KAJ) |
| Plaintiff(s), | |
| vs. | |
| Universal Forest Products, Inc. | |
| Defendant. | |

## CERTIFICATE OF SERVICE

I, Heidi E. Sasso, certify that I am not less than 18 years of age, and that service of the Notice of Appeal was made on October 24, 2005 upon:

**Via Hand Delivery**
John T. Carroll, Esquire
Cozen O'Connor
1201 North Market Street, Ste. 1400
Wilmington, DE 19801

**Via Federal Express**
Joseph L. Steinfeld, Jr., Esquire
A-S-K Financial LLP
2600 Eagan Woods Drive, Ste. 220
Eagan, MN 55121

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated: October 24, 2005

*Heidi E. Sasso*
Heidi E. Sasso

Document #: 48536