UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Bk. No. 99-02261-PJW<br>(Jointly Administered) |
| Hechinger Investment Company of Delaware, Inc., *et al*,<br>　　　　　　　　　　　　　　Debtor, | Chapter 11 |
| Universal Forest Products, Inc.,<br>　　　　　　　　　　　　　　Appellant, | |
| vs. | Civil Action Nos. 05-497 and 05-498 (KAJ) |
| Hechinger Liquidation Trust, as successor in interest to Hechinger Investment Company of Delaware, Inc., *et al.*, Debtors in Possession,<br>　　　　　　　Appellee and Cross-Appellant. | |

**BRIEF OF APPELLEE IN OPPOSITION TO APPELLANT AND IN SUPPORT OF
ITS CROSS-APPEAL FOR DENIAL OF PREJUDGMENT INTEREST**

COZEN AND O'CONNOR
John T. Carroll, III, Esq., DE SBN 4060
Chase Manhattan Centre
1201 North Market Street, Suite 1400
Wilmington, DE  19801
Telephone: (302) 295-2000   Fax: (302) 295-2013

and

Joseph L. Steinfeld, Jr.,  DC SBN 297101,
MN SBN 0266292, VA SBN 18666
Kelly J. Shannon, Esq., MN SBN  0312952
Kelly L. Mangan, Esq., WI SBN 1032576,
MN SBN 0317901
A·S·K FINANCIAL, LLP
2600 Eagan Woods Drive, Suite 220
Eagan, MN  55121
Telephone: (651) 406-9665   Fax: (651) 406-9676

Co-Counsel For Appellee and Cross-Appellant,
Hechinger Investment Company of Delaware, Inc.,
Debtor in Possession

Dated: November 23, 2005

## TABLE OF CONTENTS

I.     Statement of the Issues ............................................................................1

II.    Statement of the Case ..............................................................................2

       A.     Nature, Course and Disposition ....................................................2

       B.     Statement of the Facts ..................................................................3

III.   Argument...................................................................................................10

       A.     The Bankruptcy Court Erred In Denying Plaintiff Prejudgment Interest, And Doing So Without Findings Or Opinion Is Reversible Error (Cross-Appeal Issue) ................................................................................................10

       B.     The Bankruptcy Court Properly Ruled That Both Hechinger And UFP Intended Payments Be Applied to Shipped Goods To Stay Within The Credit Limit, And There Was No Intent by Hechinger Or UFP To Pay Contemporaneously For Goods As They Shipped ..........................................................................12

       C.     The Bankruptcy Court Correctly Ruled That The Transfers Were Not Within The Ordinary Course Of Business Between The Parties, Nor Were They Within Ordinary Business Terms In The Industry .......................................................21

              1.     Prior Payment Practices Establish That The Transfers Were Outside The Ordinary Course Of Business Between Hechinger And UFP ..............................................................................21

              2.     Defendant Failed to Meet Its Burden Under 11 U.S.C. §547(c)(2)(C), And The Bankruptcy Court Properly Found The Transfers Failed To Meet The Definition Of Ordinary Business Terms In The Industry ..........................................................28

              3.     Defendant's Arguments Reflect A Misunderstanding Of The Law And Rely Heavily On Non-Precedential Cases Not Followed By The Third Circuit ..................................................................31

       D.     The Bankruptcy Court Properly Denied Defendant's Motion *In Limine* #1 (Spoliation of Evidence) ...............................................................33

IV.    Conclusion     ...........................................................................................40

## TABLE OF AUTHORITIES

### Cases

Anderson v. City of Bessmer City, North Carolina, 470 U.S. 564, 573-574 (1985) ...............14, 15

Bonapfel v. Lubold (In re Family Home Sales Center, Inc., 65 B.R. 176, 177 (Bankr.N.D.Ga. 1986) ..............................................................................................................................20

Brewer v. Quaker State Oil Refining Corporation, 72 F.3d 326, 334 (3d Cir. 1995) ........36, 37, 38

In re CM Holdings, Inc.. 264 B.R. 141, 154-55 (Bankr.D.Del. 2000) .......................................33

In re Contempri Homes, Inc., 269 B.R. 124, 127-129 (Bankr.D.Pa. 2001)................................15

Creditors' Committee v. Spada (In re Spada), 903 F.2d 971, 974-75 (3d Cir. 1990) .................13

Ferrer v. Prusa Distribution Corp. (In re Kiddy Toys, Inc.), 178 B.R. 928 (Bankr.D.P.R. 1994) .................................................................................................................................31

Fiber Lite Corporation v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.), 18 F.3d 217, 224, 227 (3d Cir. 1994)................................................................23, 28, 29

Gatti v. Cebco (In re Deliland Foods Corp.), 2005 WL 751929 (D.Del.) ..................................32

In re Hechinger Investment Co. of Delaware, Inc., 326 B.R. 282 (Bankr.D.Del. 2005)...............3

Kallen v. Litas, 47 B.R. 977, 983 (N.D.Ill.1985) ......................................................................20

In re Logan Square East, 254 B.R. 850, 855-856 (Bankr. E.D.Pa. 2000) ............................22, 24

In re M Group, Inc., 308 B.R. 697, 702 (Bankr.D.Del. 2004) ...................................................24

In the Matter of Milwaukee Cheese Wisconsin, Inc., 112 F.3d 845, 847, 849 (7th Cir. 1997) ..............................................................................................................................11, 12

Miller v. Florida Mining and Materials (In re A.W. & Associates, Inc.), 196 B.R. 900, 906 (Bankr.N.D. Fl. 1996) ...........................................................................................................32

Nation-Wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 218 (1st Cir. 1982) ..............................................................................................................................37, 38

P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In the matter of P.A. Berner & Company), 140 F.3d 1111, 1123 (7th Cir. 1998) ....................................................................................12

Parmelee v. Greensburg (In re L&T Steel Fabricators, Inc.), 102 B.R. 511, 521 (Bankr.M.D.La. 1989)....................................................................................................................................10

In re Roberds, Inc., 315 B.R. 443 (Bankr.S.D.Ohio 2004) ......................................................25

In re Schick, 234 B.R. 337, 348 (S.D.N.Y.1999) ....................................................................25

Schmid v. Milwaukee Electric Tool Corp., 13 F.3d 76, 79-80 (3d Cir. 1994) ........................37, 38

Scott Peltz v. Worldnet Corporation (In re USN Communications, Inc.), 280 B.R. 573, 602

(Bankr.D.Del. 2002)..........................................................................................................11

Scroggins v. BP Exploration & Oil, Inc. (In re Brown Transport Truckload, Inc.), 161 B.R. 735,

740 (Bankr.N.D.Ga. 1993) ...............................................................................................32

In re Tennessee Valley Steel Corp., 201 B.R. 927, 936 (Bankr.E.D.Tenn. 1996) ....................32

Thelma C. Raley, Inc. v. Kleppe, 867 F.2d 1326, 1328 (11th Cir. 1989) ...................................11

Trinkoff v. Porters Supply Co. (In re Daedalean, Inc.), 193 B.R. 204, 211, 212 (Bankr.D.Md.

1996) .................................................................................................................................31, 32

Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.), 4 F.3d 1556, 1560, 1566

(10th Cir. 1993) ...............................................................................................................11, 12

United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948) ...................................................11

In re Wechsler, 121 F.Supp.2d 404, 415, 428 (D.Del. 2000) ...............................................38, 39

Wm.T.Thompson v. General Nutrition Corp., Inc., 593 F.Supp. 1443, 1446, 1456 (C.D.Cal.1984)

.............................................................................................................................................39

Zenith Radio Corporation v. Hazeltine Research, Inc., 395 U.S. 100 (1969) .......................14, 15


## Rules & Other Authorities

11 U.S.C. § 547 ............................................................................................................2, 10
11 U.S.C. § 547(c)(1), (2), and (3)  ...................................................1, 2, 3, 14, 20, 22, 25, 28, 40
11 U.S.C. § 547(g) ...........................................................................................................30
11 U.S.C. § 550 ................................................................................................................2
11 U.S.C. § 550(a) ...........................................................................................................10
11 U.S.C. § 1107 ..............................................................................................................10

COMES NOW, Hechinger Investment Company of Delaware, Inc., *et al.,* Debtors in Possession ("Hechinger" or "Plaintiff" or "Appellee" or "Cross-Appellant"), by and through counsel, and hereby files this Brief of the Appellee in opposition to Appellant's brief and in support of its cross appeal (the "Cross Appeal") against Defendant, Universal Forest Products, Inc. ("Appellant" or "Defendant" or "UFP").

## I. STATEMENT OF THE ISSUES

1.      Did the Bankruptcy Court abuse its discretion by failing to grant Hechinger's request for prejudgment interest, and does the Court's failure to make any findings of fact or conclusions of law on this issue represent clear error?[1]

2.      Did the Bankruptcy Court correctly hold that the "contemporaneous exchange for new value" defense under 11 U.S.C. § 547(c)(1) was not available to UFP because, at the time of each transfer, the evidence established Hechinger intended to pay for previously shipped goods so that Hechinger could fully utilize its $1 million credit limit?

3.      Did the Bankruptcy Court correctly hold that the "ordinary course of business" defense under 11 U.S.C. § 547(c)(2) was not available to UFP because the transfers involved a significant deviation from the long-established method, terms, timing, pattern, and practice of payment between the parties as well as within UFP's industry?

4.      Did the Bankruptcy Court correctly deny UFP's spoliation motion because there is no evidence that the case-wide document destruction during Hechinger's downsizing after bankruptcy included any documents that could have assisted UFP in its defense, and because the

---

[1]  This statement is the issue presented in Hechinger's Cross-Appeal against UFP.

**BRIEF OF APPELLEE**

destruction happened long before this litigation began and was not intended to hinder UFP's defense?

## II.  STATEMENT OF THE CASE

### A.    NATURE, COURSE, AND DISPOSITION

This adversary proceeding is related to a bankruptcy case filed by Hechinger Investment Company of Delaware, Inc., *et al.* on June 11, 1999 under Chapter 11 of Title 11 of the United States Code in this Court.  This adversary proceeding was initiated on June 5, 2001 when Plaintiff filed a complaint in this Court against UFP for the avoidance and recovery of preferential transfers pursuant to 11 U.S.C. §§ 547 and 550.  Plaintiff filed its First Amended Complaint to Avoid and Recover Transfers of Property on August 15, 2001. Plaintiff's Exhibit P11 (hereinafter "P__").  This preference action sought to avoid and recover transfers totaling $16,703,604.57 made to Defendant during the 90 day preference period (the "Preference Period"). P11.  The Court ruled $6,576,603.36 was paid in advance, based on this amount being agreed to by Hechinger and UFP in their cross motions for summary judgment.[2]  The amount at issue was thereby reduced to $10,127,001.21.

Trial in this matter was held before the Honorable Paul B. Lindsey on February 25, 2005. Prior to trial, Hechinger and UFP (collectively, the "Parties") stipulated to Plaintiff's *prima facie* case and Defendant's new value defense.  Therefore, the agreed net preference at issue (antecedent debt only), subject to Defendant's 11 U.S.C. §§ 547(c)(1) and (c)(2) defenses, was $1,004,216.03 (the "Net Preference" or the "Transfers").  After the bench trial and post trial

---

[2]  Memorandum decision, dated December 14, 2004, on cross-motions for summary judgment.

briefing, the Court took the matter under advisement.  In a Memorandum Opinion Judge Lindsey found:  1) Hechinger did not intend the payments at issue to be contemporaneous exchanges for new value, as required by 11 U.S.C. § 547(c)(1), as Hechinger intended its payments to reduce its outstanding debt with UFP; 2) Hechinger's payments to UFP were also not made in the ordinary course of business or financial affairs of the debtor and the transferee as required by 11 U.S.C. § 547(c)(2)(B) because the payments were made under vastly different conditions and in a wholly different manner than the previous 15 years of the Parties' transactions; and 3) UFP failed to sustain its burden of proving that the transfers were made according to ordinary business terms as required by 11 U.S.C. § 547(c)(2)(C) because the payments were not consistent with the Defendant's industry.  In re Hechinger Investment Co. of Delaware, Inc., 326 B.R. 282 (Bankr.D.Del. 2005).  On June 16, 2005, the Bankruptcy Court issued its Memorandum Opinion (the "Opinion") granting Plaintiff judgment in the amount of $1,004,216.03. (hereinafter "Opinion, p___").  The Court denied Plaintiff's request for prejudgment interest without comment other than stating the Court was exercising its discretion.  Opinion, p. 20.  The Parties requested and received a transcript of the trial proceeding herein (hereinafter "TT __").[3]

## B.    STATEMENT OF FACTS

Throughout their 15-year relationship, Hechinger and UFP did business on 30-day credit terms without a credit limit. TT 29, 43-44.  In 1998, Hechinger was UFP's sixth largest customer with sales of $37 million. P46.  Historically, UFP provided Hechinger with unlimited credit and had credit exposure of $3 million to $4 million at any given time throughout the peak shipping season

---

[3] The trial transcript is entitled "Transcript of Motions Hearing Before the Honorable Paul B. Lindsey, United States Bankruptcy Judge, dated February 25, 2005."

**BRIEF OF APPELLEE**

(the late winter and spring months). P12b.  By February 1999, it became clear to UFP that Hechinger was having severe financial difficulties. P29.  UFP wanted to greatly reduce, if not eliminate, its credit exposure during the 1999 peak shipping season in case Hechinger filed bankruptcy. TT 44.  To accomplish this, UFP requested Hechinger either provide security for its purchases from UFP or agree to cash in advance payments. TT 53, P29.  Hechinger refused either option and threatened to seek other vendors for its pressure treated lumber if such credit terms were non-negotiable. TT 187-188.  Not wanting to lose such an important customer, but still fearing the large credit exposure, UFP offered to ship on credit but with a $1 million limit. P34.  Hechinger reluctantly agreed to this onerous credit arrangement.  TT 196-197.  However, UFP had no intention of honoring the $1 million credit limit. TT 196-197.  Instead, UFP managed, through collection pressure and intentional misrepresentations of Hechinger's available credit, to reduce its loss exposure from more than $1 million to a $1 million credit balance in its favor on the eve of Hechinger's bankruptcy filing. TT 108,117,124-126.

Under the new credit arrangement beginning February 15, 1999, UFP required Hechinger to wire money to stay at or below the $1 million credit limit. P34.  Despite an agreement to keep the lines of communication open, UFP began to take a different, secret approach less than one month later.  Jim Ward, a regional Vice President at UFP, issued an internal order for plants to "hold or slow down shipments until further notice," and confirmed that it was "a **silent slow down** as far as the customer is concerned." (emphasis added). P35.  Then, notwithstanding Cliff Smith's (former Hechinger Executive Vice President) explicit opposition to a credit limit of $500,000, UFP

**unilaterally** dropped the credit limit to $500,000. P37.  Brian Schumaker's (Credit Manager of

UFP) electronic message to employees of UFP on March 5, 1999, confirms its secret nature,

> Keep this information CONFIDENTIAL.  Continue to hold orders.  We have
> dropped their credit limit from 1,000,000 to 500,000.  Our current receivable
> balance is at close to 500,000.  We are expecting another wire from them on
> Monday morning.  After this wire is confirmed we will instruct you to release your
> orders. (capitalization original).

P37.

When Mr. Smith later found out about UFP's March 5, 1999 unilateral imposition of the

$500,000 credit limit, Ms. Beth Nickels (former CFO of UFP) and Mr. Smith again discussed

Hechinger's financial state and UFP's comfort level. P44.  Mr. Smith informed UFP that Hechinger

would not continue to do business with UFP at a $500,000 credit limit. TT 195.   In an April 8,

1999, letter to Cliff Smith, Beth Nickels stated, "To further illustrate our commitment to the future

of HQ[4], we have decided to increase the credit limit to $1 million, effective today, April 8th." P44.

Mr. Smith testified, "I think it just came to a point where they had to go to a million or lose a lot

of business.  I was taking the major markets away from her.  I know one was Washington that we

had found an alternate supplier for, which was a lot of business for them." P7, p.69.

The subsequent course of dealings between the parties shows that, despite the promise to

increase the credit limit back to $1 million on April 8, 1999, Ms. Nickels and UFP had **no**

**intention** of increasing Hechinger's credit limit to $1 million. P45, P45, TT 196, 203.  At trial, Ms.

Nickels testified:

---

[4]  Hechinger was also referred to as "HQ" because the name of one of its divisions was
"Home Quarters."

Q.    And to the best of your knowledge and belief, you never communicated to Hechinger any time thereafter that their credit limit was anything under $100 million -- I'm sorry, under $1 million.

A.    $1 million.  Correct.

Q.    All the way to bankruptcy.

A.    I don't believe so.

Q.    You never told them --

A.    I --

Q.    -- it was less than that?

A.    Correct.  I don't believe it ever was less than that.

Q.    Notwithstanding that, you were aware, though, that your company was carefully monitoring the shipments --

A.    Yeah.

Q.    -- to make sure that their actual exposure was as close to zero as possible.

A.    Our actual accounts receivable credit exposure, yes.

TT 196.  Ms. Nickels also testified:

Q.    Then I asked you, "But the goal was, as I understand it, notwithstanding a promised credit limit of $1 million, you desired internally to keep that at or near zero." Your answer?

A.    "Yes."

TT 203.  On May 22, 1999, Ms. Nickels discussed Hechinger's financial status and her plan to

protect UFP.  P45.  The electronic correspondence states:

HQ failed to make a $4.7 million interest payment which was due on May 15th. They are taking advantage of a 30 day "grace" period.  If they don't make payment at end of 30 days, they will be in default of the Senior Debentures...

Net worth is now a NEGATIVE $66 million.  This is important because they will not meet one of the covenants and will be required to repurchase $42 million of properties in February 2000." (capitalization original).

**We have tightened our credit and will continue to try to keep our exposure at zero–BUT PLEASE don't discuss this.  They still believe they have a $1 million credit limit with us.  They are wire transferring to us based on orders in the system, but orders are starting to ship slower, so we have been able to stay ahead of the game. ..** (capitalization original).

BRIEF OF APPELLEE

-6-

> **Brian is managing the situation on a daily basis, and thus far HQ has followed through on every one of our requests for wires.**
>
> This is very similar to the Payless situation a couple years ago. It will be very helpful if we don't sound a panic bell to other vendors. If other vendors call us, please simply say we are managing our credit and trying to keep our exposure as low as possible while still providing them with product. At this time, HQ is very happy with us and the commitment we've shown them.

P45 (emphasis added).

When asked whether Hechinger had ever wired payments to UFP prior to February of 1999, Mr. Smith testified that he did not know of any other occasion. P7, pp. 99. Mr. Smith also testified that Hechinger generally paid UFP by sending checks in the mail from its accounts payable department in Virginia Beach. P7, pp. 99. Wire transfers were approved and made through Hechinger's corporate headquarters in Largo, Maryland, while the accounts payable department was located in Virginia Beach. TT 218-219. Due to the high volume of orders, shorter credit terms, and restricted credit limit, Hechinger could not reconcile the payments with invoices before being informed by UFP that additional wire transfers were necessary to pay for past shipments, so Hechinger wired funds at UFP's request and sent remittances 2 to 4 weeks later. TT 68-69.

Due to its complicated accounting system, when Hechinger made payments for goods shipped or received but for which the invoices were not yet matched to enable reconciliation with a payment, Hechinger termed those payments as "advance" or "on account" payments. Defendant's Exhibit 63, pp. 319-320 (hereinafter "D__"). When asked to explain these terms, as seen in the accounts payable documents, James Iampieri (former Hechinger Vice President of Merchandising) testified "Advance was a term that Hechinger used when describing payments that were generally made in round dollar amounts, and in the case of UFP, it was appropriate because

of the reduction in our credit limit and the rapid turnover of the goods that results in a large dollar amount of shipments being in the pipeline, being in process, if you will ...." D63, pp. 319-320.

When asked about Hechinger's policies regarding wire transfers, Marcyana Muller, former Supervisor of Cash Disbursements and Audit, testified "when the wire was authorized and paid, a credit for that wire was to be put on the vendor's account so that invoices could be applied against that credit for the payment on account." P10, p. 63:3-11. Ms. Muller testified that the first she encountered a reconciliation of invoices subsequent to wire transfers was when dealing with UFP's account in February 1999. P10, p. 63:22 and 64:1-2.

UFP used wire transfers of lump sums, a newly imposed credit limit and shortened terms to get more money from Hechinger when it was not needed. TT 126-128. UFP's witness, Brian Schumaker, testified UFP was able to do this because Hechinger had to rely on UFP for information as to what it owed and how close it was to its credit limit. TT 136-138. Hechinger was not able to determine the actual level of credit available because it took a while for them to process the invoices from the various plants. TT 136-138. UFP used the situation to deny Hechinger credit by "silently" holding and slow shipping orders, while notifying Hechinger it needed to pay additional dollars to stay within its "credit" limit. TT 116-119. Mr. Schumaker testified at trial:

> Q.    Yet if the orders are starting to ship slower, wouldn't you expect that you would not be needing as much advance pay from Hechinger to stay ahead of the game, so to speak?
> A.    The payment probably would have been spread out, correct.
> Q.    Well, I'm asking you that if the orders were shipping slower, you must have been filling the orders slower at that time too, correct?
> A.    Yes.
> Q.    Okay, so by filling these orders slower, you were able to stay ahead of the game, correct?
> A.    Yes.

Q.  And in this case, the game was to stay to the good, to not have a credit exposure?

A.  Correct.

Q.  And you were very successful even at the end because you were often up, at the high there, it looks like $1.11 million.  1.11 million, do you see that?

A.  Yes.

Q.  Okay.  You never informed Hechinger that you had $1.11 million of their money, did you, at that time?

A.  Not that I recall.

TT 126.  UFP's plan to keep its exposure at zero worked so well that it sent congratulatory e-mails applauding its efforts and warning UFP personnel not to reveal the plan to Hechinger or other trade creditors. P45, P51.

The evidence also showed that UFP's treatment of Hechinger's account was not normal with respect to the pressure treated lumber industry. TT 92-93, 117-118.  Mr. Schumaker testified:

Q.  Okay.  Now isn't it true that for the big box stores, I believe you already testified, that they had unlimited credit historically with your company?

A.  Yes.

Q.  Okay.  And isn't it also true that notwithstanding the 200 or so terms that you just talked about before we took a break, that the standard term for these big box stores was the 1% 10, net 30?

A.  Correct.

Q.  So that all those other terms really don't apply to the big box stores?

A.  In some cases they could.  If we had special programs going, but for the most part, standard terms was the 1% 10, net 30.

TT 92-93.  Mr. Schumaker also testified that UFP silently slowed down shipments to Hechinger as a collection tool to reduce its credit exposure. TT 117-118.

UFP was also aware that its unusual collection tactics could lead to preference liability. P50.  In electronic correspondence from Beth Nickels to another UFP employee dated June 17, 1999, Ms. Nickels discussed continuing UFP's bad debt accrual, and stated, in relevant part:

**BRIEF OF APPELLEE**

> ...we still have a potential risk as it related to preference payments on the monies we were receiving pre-petition. Until we find out if HQ is going to exercise their preference rights, we need to keep this reserve in place and continue to accrue. Our best estimate right now is that they could assert that up to $1 million of payments to us were preference. OF course, we will fight it, but it is definitely a risk we were aware of when we started receiving the wires. (capitalization original).

P50.

### III. ARGUMENT

> A.    THE BANKRUPTCY COURT ERRED IN DENYING PLAINTIFF PREJUDGMENT INTEREST, AND DOING SO WITHOUT FINDINGS OR OPINION IS REVERSIBLE ERROR (CROSS-APPEAL ISSUE)

Pursuant to Section 550(a) of the Bankruptcy Code, a plaintiff is entitled to recover prejudgment interest.[5] 11 U.S.C. § 550(a). Section 550 allows the Plaintiff to recover the value of property transferred under 11 U.S.C. § 547. 11 U.S.C. § 550. The policy of Section 550 is to **restore the estate to the full value** of the asset transferred to the preferred creditor, thereby compensating the estate for the loss of the time value of the asset. In re L&T Steel Fabricators, Inc., 102 B.R. 511, 521 (Bankr. N.D.La. 1989) (emphasis added).

Hechinger requested an award of prejudgment interest in its First Amended Complaint and in Plaintiff's Trial Brief. P11. Defendant had been aware of its preference liability since at least June 17, 1999, and has had the use and benefit of the funds for over six years. P50. Plaintiff

---

[5] Pursuant to 11 U.S.C. § 1107, the debtor in possession "shall perform all the functions and duties . . . of a trustee serving in a case under" Chapter 11. In addition, 11 U.S.C. § 550(a) states in relevant part: To the extent that a transfer is avoided under Section . . . 547 . . . of this Title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . 11 U.S.C. § 1107.

calculated prejudgment interest from June 4, 1999[6], through the date of trial, at $283,820.76; this amount should have been awarded.

Notwithstanding the statutory policy of awarding prejudgment interest, Judge Lindsey denied the Plaintiff's request, stating only "[t]his Court, in its discretion, declines to award pre-judgment interest to Plaintiff." Opinion, p. 20.  An appellate court reviews a bankruptcy court's decision to award prejudgment interest for abuse of discretion. In re Investment Bankers, Inc., 4 F.3d 1556, 1566 (10th Cir. 1993).  In order to determine whether the Court abused its discretion, findings of fact are reviewed to determine if they are "clearly erroneous." Id. at 1560.  A finding is clearly erroneous "if the record lacks substantial evidence to support it so that the Court has the definite and firm conviction that a mistake has been committed." Thelma C. Raley, Inc. v. Kleppe, 867 F.2d 1326, 1328 (11th Cir. 1989), citing United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).  Here, the Bankruptcy Court's finding is clearly erroneous because there were absolutely no findings of fact made.  At a minimum, the case must be remanded for Judge Lindsey to enumerate his reasons for denying prejudgment interest.

The Delaware Bankruptcy Court found, in another matter, both the Bankruptcy Code's policy of equal distribution to creditors and congressional policy favor the award of pre-judgment interest in order to compensate the estate for the time it was without use of the transferred funds. In re USN Communications, Inc., 280 B.R. 573, 602 (Bankr.D.Del. 2002).  The Court found "Discretion must be exercised according to the law, which means that pre-judgment interest should be awarded unless there is a sound reason not to do so." Id. at 602, citing Matter of Milwaukee

---

[6] June 4, 1999 is the date of the last allegedly preferential transfer during the Preference Period.

**BRIEF OF APPELLEE**

<u>Cheese Wisconsin, Inc.</u>, 112 F.3d 845, 849 (7th Cir. 1997). Here, there is no way to determine the factors considered by Judge Lindsey, as they are not stated in the Opinion.

In <u>In the Matter of P.A. Bergner & Co.</u>, the Seventh Circuit Court of Appeals reversed the bankruptcy court's denial of pre-judgment interest. 140 F.3d 1111, 1123 (7th Cir. 1998), *citing* <u>Milwaukee Cheese</u>, 112 F.3d at 847. Therein the Court stated "prejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money," and "prejudgment interest should be awarded unless there is a sound reason not to do so." <u>Id.</u> Also, in <u>Investment Bankers</u>, a bankruptcy court awarded pre-judgment interest, and the Tenth Circuit affirmed, stating "in bankruptcy proceedings, the courts have traditionally awarded prejudgment interest to a trustee who successfully avoids a preferential or fraudulent transfer . . . unless the amount of the contested payment was undetermined prior to the bankruptcy court's judgment." 4 F.3d at 1566.

As the factors for the award of prejudgment interest were not considered or delineated by the Bankruptcy Court, the denial of prejudgment interest represents clear error and remand with instructions is proper herein.

**B.    THE BANKRUPTCY COURT PROPERLY RULED THAT BOTH HECHINGER AND UFP INTENDED PAYMENTS BE APPLIED TO SHIPPED GOODS TO STAY WITHIN THE CREDIT LIMIT, AND THERE WAS NO INTENT BY HECHINGER OR UFP TO PAY CONTEMPORANEOUSLY FOR GOODS AS THEY SHIPPED**

The Bankruptcy Court correctly found that Hechinger lacked the requisite intent for the Transfers to be protected by the "contemporaneous exchange for new value" defense. Opinion, p. 11. To successfully assert this defense, Defendant had to show (i) that both parties intended the

transfer to be a contemporaneous exchange for new value, (ii) that the exchange was in fact

contemporaneous, and (iii) that Defendant in fact gave new value to Plaintiff. In re Spada, 903 F.2d

971, 974-75 (3rd Cir. 1990).  The key element is the intent of the parties.  Id. at 975.

The trial testimony, including witnesses for Hechinger **and** UFP, supports the Bankruptcy

Court's finding that there was no intent to exchange new goods for payment contemporaneously

therewith.  Ms. Nickels testified UFP intended to apply the payments to existing debt, rather than

shipments that were going out:

> Q.    And it was your understanding, too, that once you got the money internally, you
>        booked it against the then already-shipped orders?  In other words, you reduced
>        your credit exposure at that point?
> A.    We reduced our credit exposure?  Yes.

TT 160.

Also, Mr. Schumaker testified regarding the Parties' intent for the wire transfers to reduce

outstanding debt:

> Q.    Okay, and at the bottom she says, "We will expect you to continue -- we expect
>        to continue receiving wire transfers as needed to keep us at or below the $1
>        million limit."  Do you see that?
> A.    Yes.
> Q.    Okay, so that the wires were supposed to go to reduce the credit limit so that
>        additional purchases could be made, correct?
> A.    Correct.

TT 139-140.

Further, Hechinger stated its intent was to utilize its available credit and apply payments

to the oldest outstanding debt, to pay for goods that had been shipped by UFP.  Mr. Smith

testified:

**BRIEF OF APPELLEE**

> Q.    When dealing with Brian or Beth with respect to them requesting wire transfers being made, did you ever discuss anything about the shipments that were pending?
>
> A.    The conversations pretty much went like this: "Your credit line is at $1 million. That's what you're allowed. That's what we agreed on. And there's $500,000 worth of orders coming in. So I need, by next Wednesday, by Wednesday -- and it was usually Tuesday -- $500,000 to lower the credit limit so I can release those orders." And that's exactly how we played it day-in, day-out, week-in, week-out.
>
> Q.    And did he ever say anything with respect to the $500,000 of shipments that were pending?
>
> A.    He didn't say -- he just said there was a $1 million credit limit and $500,000 in, you know, in orders. We --
>
> Q.    Was it -- I'm sorry?
>
> A.    We didn't -- I didn't think about pending or anything like that. I knew that I had to pay my credit limit down so that I could resume shipment.
>
> Q.    So once it was paid down it was your understanding that they would ship?
>
> A.    Right. ...

TT 221. Mr. Smith testified further:

> Q.    You stated that if there was, however, a million dollars that was already shipped -- that was your example, correct?
>
> A.    There was a million dollars in credit that we used. We used a million dollars in credit already. Okay, that's what I -- my goal was to keep them at a million dollars in credit, to keep them right on the edge to owing us a million dollars -- us owing them a million dollars. At all -- at every given minute, based on the information that I had, that's what I tried to do ....
>
> Q.    To use the credit --
>
> A.    To use the credit, sure, the company was financially, you know -- was having tough times. We used everybody's dollars that we could to ease our own burden.

TT 220-221.

The Bankruptcy Court considered the foregoing testimony in its determination that Hechinger lacked the requisite intent under 11 U.S.C. § 547(c)(1). "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 573 (1985) (*quoting* Zenith Radio Corp. v.

Hazeltine Research, Inc., 395 U.S. 100, 123 (1960)).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Anderson, 470 U.S. at 573-74.

In In re Contempri Homes, Inc., 269 B.R. 124, 128 (Bankr.D.Pa. 2001), the Court found no contemporaneous exchange where, as here, both parties intended the payments be applied to the oldest invoices.  The Court stated:

> Payments made to a supplier of goods as a prerequisite to the shipping of more goods to the debtor are not intended by the parties as a contemporaneous exchange for new value even though the payments roughly correspond to the value of the new goods shipped.

Id. at 129.  The defendant in Contempri Homes argued the parties had created a "modified C.O.D." arrangement.  Id. at 127.  UFP attempted the same argument that failed for the defendant in Contempri Homes.  In its Opinion, the Bankruptcy Court rejected UFP's "modified C.O.D." argument and found the "record supports Hechinger's argument that such calls merely alerted Hechinger to the fact that orders could not be shipped unless and until Hechinger remitted funds to reduce its outstanding debt to a point at which the subsequent shipments would not put it over its credit limit."  Opinion, p. 11.

UFP mistakenly asserts Hechinger's remittance advices, which were matched up with shipments 2-4 weeks after each wire transfer payment, establish "intent" as a matter of law.  UFP Brief, p. 10.  UFP contends circumstantial evidence creates the requisite intent here, and all testimony should be ignored. UFP Brief, p. 11.  UFP argues this solely because payments were

**BRIEF OF APPELLEE**

made quickly and because **some of the invoices** matched with the wires included payments in advance of shipment. Appellant's Brief on Appeal, p. 11 (hereinafter "UFP Brief, p. __").

First, **the Transfers at issue on appeal are only those payments made on account of antecedent debt**. The Parties stipulated to antecedent debt to narrow the issues and because it was easiest to use the remittances that were already reconciled, rather than recreate a daily analysis of shipments and payments. Amended Joint Pretrial Memorandum, p. 4. Plaintiff is not arguing, nor does it need to, that Hechinger intended an application of payments different from what is reflected in the remittances. In fact, Hechinger used the remittances in its analysis of the payments. P56.

Defendant also avers "[a]ll of the documentary evidence in the record bearing on this issue - literally all of it - shows that Hechinger knew it was pre-paying for UFP's goods, including millions of dollars of unshipped orders." This is absolutely untrue. The following documents in the record, among others, support the Bankruptcy Court's findings:

- On February 19, 1999, Cliff Smith circulated a memorandum putting UFP on the "first to pay" check run because the $1 million credit line was at $800,000, and there were $900,000 in additional orders. D50.

- On March 8, 1999, while the credit limit was $500,000, Hechinger requested that accounts payable wire UFP $500,000 because "[t]heir statements show that we currently owe $446,000 and there are more than $500,000 in orders waiting to be shipped." D9.

- Another wire transfer request, on April 9, 1999, instructed accounts payable to send UFP $500,000. D17. Although UFP had raised the credit limit to $1 million, UFP informed Hechinger it had reached the credit limit. D17. This transfer of $500,000 while the credit limit was $1 million evidences Hechinger's intent to pay down old debt to free up credit so new orders could be shipped.

**BRIEF OF APPELLEE**

- Again, on April 26, 1999, Hechinger authorized a $1 million wire transfer to pay off the credit limit because $850,000 in additional orders (beyond the $1 million) were awaiting shipment. D23.

Each of the foregoing documents manifests Hechinger's intent for the wire transfer payments to reduce outstanding debt rather than pay for new orders.

Second, in analyzing these antecedent payments, the Bankruptcy Court properly found that **neither Hechinger nor UFP intended to pay contemporaneously with shipments**. Opinion, p. 11. UFP controlled the relationship and demanded Hechinger make wire transfer payments when the credit limit was reached. With respect to the relationship between the Parties during the Preference Period, Mr. Schumaker testified on behalf of UFP:

> Q.   Okay, and you said that -- let's say you had an outstanding balance. Let's say hypothetically the outstanding balance was $400,000, okay. And that you had requested -- there were enough orders in the system that you wanted $1/2 million payment and the $1/2 million payment came in. Would you not apply it, at least internally, against the outstanding AR to reduce your credit exposure?
>
> A.   Yes, internally it would be thrown in that unapplied bucket which would go against it. We wouldn't actually pay off invoices with that money.
>
> Q.   Because you hadn't had it applied yet, but internally when you kept track of how much money Hechinger owed you –
>
> A.   Correct.
>
> Q.   -- in that case, it would be zero because they would have paid the half -- the would have paid the $400,000 of outstanding invoices?
>
> A.   Yeah, if or -- it would have been negative if they would have paid for the orders as well.
>
> Q.   Right, so in that case they actually -- you would have held 100,000 that would have applied to future orders –
>
> A.   Correct.

TT 93-94. Mr. Schumaker went on:

> Q.   So you knew at all times how much money Hechinger owed you for orders that had already shipped out?
>
> A.   Yes.

Q.     And you also knew when they paid you what your credit exposure was at all times?

A.     Yes.

TT 94-95.

Mr. Smith confirmed on behalf of Hechinger. He testified:

Q.     And Universal Forest Products knew that you would not be able to tell, due to the system, what there was outstanding?

A.     Yes.

Q.     Which is why you agreed to rely on Universal Forest Products to tell you?

A.     We came up to the resolution -- well, they were, you know, quite frankly, they were -- had been doing business with the company for 15 years. They had a very good reputation within the company. They were a reliable vendor. The best way -- and like I said, this is, you know, 4 or 5 months before the bankruptcy. Things are getting tough. Everybody's busy keeping goods flowing to the stores. And the only way we could come up to -- to figure out how to get the products to the stores was for them to call when they needed money. And, you know, say you're out of your million dollar credit limit where we've got $500,000 of orders coming in, you need to pay your credit limit down to $500,000.

Q.     Now, you've heard testimony here today that the credit limit includes both goods that have been shipped and orders that were in the system, correct?

A.     That's what I've heard, yeah.

Q.     And the example that you just gave with respect to when a wire transfer would have been requested, if they had asked you to in that same scenario to pay, for example, the entire $1.5 million, what would you have told them?

A.     No.

TT 219-220.

UFP's witnesses also testified (because it knew its credit exposure at all times, but Hechinger did not know what it owed at that same point in time since there was a delay in matching shipped or received goods with invoices) it was able to reduce its exposure without Hechinger's knowledge. TT 117. Mr. Schumaker stated:

A.     Slow down meant that we would just -- instead of shipping all the orders that were due today, we'd slow down the shipments, get the stores the ones that they needed.

Q.    That's another collection tools, isn't it?

A.    Yes.

Q.    Okay, because by slowing down the shipments you're reducing your credit exposure but you're still giving the customer something?

A.    Correct.

Q.    And the word "silent slow down," is it reasonable to assume that means just don't tell the customer that you're slowing down shipments?

A.    Correct.

Q.    And you were aware that was done, at least in this one instance, with regard to Hechinger?

A.    Yes.

TT 117.  UFP took action to ensure that its exposure was zero, without ever informing Hechinger

that it no longer had a $1 million credit limit. TT 196.  Ms. Nickels testified:

Q.    Notwithstanding that, you were aware, though, that your company was carefully monitoring the shipments --

A.    Yeah.

Q.    -- to make sure that their actual exposure was as close to zero as possible.

A.    our actual accounts receivable credit exposure, yes ...

Q.    As close to zero as possible so that in the event of a bankruptcy, you wouldn't be owed any money?

A.    Correct.

TT 196-97.  Mr. Smith confirmed that Hechinger was unaware that UFP was "silently" slow

shipping orders to keep its exposure down:

Q.    This paragraph also says, "They are wire transferring to us based on orders in the system, but orders are starting to ship slower so we have been able to stay ahead of the game."  We you aware that they were slow shipping --

A.    No.

Q.    -- any product?

A.    We were not aware they were slow shipping orders.  We thought that they were just -- as we -- we were told that initially that when the orders were placed they were out the door within 24 hours.  And that's the premise that I ran under that when the orders were place they were out the door in 24 hours.  I didn't know that they were slow shipping until after the fact.

TT 227.

UFP's demands for payments, and Hechinger's wire transfer payments, were necessarily frequent given the volume of Hechinger's orders during its busy season. However, the frequency of payments cannot overcome Hechinger's intent to utilize its credit limit to the fullest so as to create a contemporaneous exchange defense.

The Court noted the contemporaneous exchange defense "may not be applied to credit transactions" and found "the nature of a credit relationship is inconsistent with the intent which is required in order to sustain the § 547(c)(1) defense." Opinion, p. 11; In re Family Home Sales Center, Inc., 65 B.R. 176, 177 (Bankr.N.D.Ga. 1986); Kallen v. Litas, 47 B.R. 977, 983 (N.D.Ill. 1985). At all times, including during the Preference Period, Hechinger and UFP maintained a credit relationship. While the credit relationship during the Preference Period had more restricted terms and a credit limit, it was still a credit relationship. Although UFP was ultimately able, through its deceptive practices, to eliminate all credit transactions, this does not alter the fact credit transactions occurred and that those credit transactions were never intended to be contemporaneous exchanges for new value.[7] UFP also argues the Code requires "substantially contemporaneous" payments, not "absolutely contemporaneous" ones. However, as the Court noted, not only is intent a necessary element, it is the most important element under 11 U.S.C. § 547(c)(1). As the Court found that no intent to engage in contemporaneous transactions existed, whether the payments were substantially contemporaneous is of no moment.

---

[7] The advance payments have no effect on whether the Preference Period antecedent payments were intended to be and were in fact contemporaneous exchanges.

Defendant's **own** witnesses acknowledged Hechinger and UFP had a credit relationship.

P45.  Ms. Nickels testified, had the Parties intended to do business contemporaneously, they could

have done so and earmarked orders to document it:

> Q.    But under this framework, Cliff felt that it wasn't gonna be possible, that they'd
>        have to wire you lump sum payments on account and then match it up later?
> A.    Right.  I mean they probably could have, if we would have taken the time every
>        day, you would end up having -- if they hadn't entered invoices into their system
>        yet, it may cause them more problems than that.
> Q.    Then it was just --
> A.    We didn't care if they sent it in lump sum or if they sent it related to specific
>        invoices, and a lump sum attached, to cover orders.  They could've given us
>        specific order numbers, an order amount.  It didn't have to be a lump sum.
> Q.    But it was agreed that it would be a -- do you know why it was agreed that there
>        would be a lump sum of wires?
> A.    To make it simple and to make sure that the product kept getting shipped . . .

TT 190-91.  The Court thoroughly reviewed the trial testimony of witnesses from both Hechinger

and UFP and found both Parties intended a credit relationship, not a contemporaneous exchange

of new goods for new payment. Opinion, p. 11.

    **C.    THE BANKRUPTCY COURT CORRECTLY RULED THAT THE
           TRANSFERS WERE NOT WITHIN THE ORDINARY COURSE OF
           BUSINESS BETWEEN THE PARTIES, NOR WERE THEY WITHIN
           ORDINARY BUSINESS TERMS IN THE INDUSTRY**

        **1.    Prior Payment Practices Establish That The Transfers Were
              Outside The Ordinary Course Of Business Between Hechinger
              And UFP**

The Bankruptcy Court found that "in imposing the credit limit, and shortening the traditional

payment terms, UFP was admittedly, and openly, attempting to limit its exposure to credit loss

should Hechinger default, and at the same time to limit its exposure to preference liability should

Hechinger ultimately wind up in bankruptcy." Opinion, p. 16.  The Court found UFP imposed

"substantial restrictive changes" immediately prior to the Preference Period, after 15 years of association under vastly different conditions. Opinion, pp. 16-17. Based on these findings, the Court was "compelled to conclude" the payments made by Hechinger to UFP during the Preference Period were not ordinary under 11 U.S.C. § 547(c)(2)(B). Opinion, p. 17.

In In re Logan Square East, 254 B.R. 850, 855 (Bankr.E.D.Pa. 2000), the Court set forth a list of factors to be considered in an ordinary course of business analysis under 11 U.S.C. §547(c)(2)(B):

 a)    the timing of the transaction or payment;
 b)    the length of time the parties engaged in the type of dealing at issue;
 c)    whether the subject transfer was in an amount other than usually paid;
 d)    whether the payments were tendered in a manner different from previous payments;
 e)    whether there was any unusual action by either the debtor or creditor to collect or pay on the debt; and
 f)    whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition.

Applying the factors to the record in this case, it is apparent that **every factor** considered in an ordinary course of business analysis differed during the Preference Period from the fifteen-year course of dealing between Hechinger and UFP:

•   UFP severely tightened credit terms from 1% 10, net 30 to 1% 7, net 8. TT 34, 61.

•   UFP imposed a restrictive credit limit, which had historically been unlimited. TT 43.

•   UFP demanded wire transfers, which had never occurred before; it had always received payment by check. TT 56.

•   UFP requested payments in larger amounts and in even lump sums. TT 64.

**BRIEF OF APPELLEE**

- Hechinger was required to transfer money on account and reconcile the payments to invoices after the fact; historically, Hechinger sent remittance advices with checks. TT 70.

- UFP held shipments without the Debtor's knowledge. TT 117-18.

- UFP lied to Hechinger about its credit limit, shipments and orders. TT 126-27.

Id.

The Bankruptcy Court acknowledged a creditor's ability to protect itself from losses when dealing with a customer in financial distress. Opinion, p. 17. However, UFP's actions were "**so extreme**, and **so out of character** with the long historical relationship between these parties, that it may only be characterized as preferential." Opinion, p. 17 (emphasis added). The structure of the preference statute and its legislative history, as articulated in In re Molded Acoustical Products, Inc., confirms this finding:

> The preference provisions are designed not to disturb normal debtor-creditor relationships, but to derail unusual ones which threaten to heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of creditors.

18 F.3d 217, 224 (3d Cir. 1994).

UFP's actions not only denied Hechinger's creditors equitable treatment, but also exacerbated Hechinger's poor financial condition, hastening its bankruptcy.[8] It is true that the Bankruptcy Code encourages vendors to continue to do business with debtors and give them credit at a time when their cash flow is generally compressed. There is also no dispute that a vendor has

---

[8] At the filing date, rather than an extension of $1 million of credit, UFP had over $1 million of Hechinger's money. Thus, UFP, through its management of credit and shipments, effectively consumed over $2 million of Hechinger's liquidity that otherwise could have been available to pay other creditors' debts.

a right to do business using only "cash in advance" or "cash on delivery" terms, but Congress did not intend for a vendor such as UFP to obtain payment pursuant to severe collection pressure in order to accomplish its purpose of eliminating its exposure without regard for Hechinger or other creditors.

The Bankruptcy Court properly rejected Defendant's absolute proposal of a "safe harbor" for all payments made within terms. Opinion, p. 14. The Court declined to "blindly accept and automatically apply the suggested 'safe harbor' doctrine to all payments made by Hechinger to UFP during the Preference Period within eight days." Opinion, p. 14. Rather, the Court engaged in the appropriate, peculiarly factual review of all aspects of the payments during the Preference Period and found the factors deviated drastically from the Parties' long relationship.

The result of UFP's argument is that only late payments could **ever** be considered preferential. Timely transactions may be outside the parties' ordinary course of business where later payments were the ordinary course of the parties' dealings. Logan Square, 254 B.R. at 855-56 (during the ten months prior to the preference period, the debtor did not make any timely payments, but two payments made during the preference period were timely; only 54% were timely during the entire 69-month non-consecutive pre-preference period put forth as evidence by the creditor; creditor also demanded a security deposit or a receiver and the payment was made by cashier's check, as further evidence that the transactions were outside the ordinary course). In In re M Group, Inc., 308 B.R. 697, 702 (Bankr.D.Del. 2004), the Court found preference period payments made within a shorter time period were outside the ordinary course of business where payments routinely were made late in the history between the parties. Other courts also recognize

that early repayment of an obligation can make the payment outside the ordinary course of business. In re Schick, 234 B.R. 337, 348 (S.D.N.Y. 1999) ("Chapter 11 debtor's early repayment of his obligation to creditor, because creditor deemed himself insecure as a result of debtor's bounced check in separate transaction between parties, was not in "ordinary course of business" between parties, and could be avoided as preferential....").

In In re Roberds, Inc., 315 B.R. 443, 467 (Bankr.S.D.Ohio 2004), the Bankruptcy Court, facing facts as egregious as in the instant case, stated:

> The court finds that in this period: (1) the credit limit of $750,000 was vigorously enforced by the Creditor; (2) credit holds, involving individual negotiations resulting in payments satisfactory to the Creditor prior to the shipment of furniture, was in effect; (3) payment terms were changed; (4) the Debtor paid, on average, earlier than Net 30 terms; and (5) other creditors were being significantly delayed, or denied, in the receipt of their payments while this Creditor was receiving accelerated payments and -- none of these had ever occurred in the parties' history.

Analyzing factors very similar to the dealings between Hechinger and UFP, the Court found the Creditor failed to sustain its burden under the subjective prong of 11 U.S.C. §547(c)(2)(B). Id.

UFP has also argued that the timing of the payments comports with the Parties' past practices. UFP Brief, p. 29.  The following graph, however, illustrates the stark difference between the Preference Period and the three years prior to that time period. P54.  During the Preference Period, 95.6% of payments were made 0-10 days from invoice date. P54.   In contrast, approximately 10% of payments were made 0-10 days during the comparable three months in 1996-1998. P54.  During the same three-month time periods in 1996-1998, 61.9% of payments were made 11-17 days from invoice, while only approximately 1% of 1999 Preference Period payments were made in that time frame. P54.

**BRIEF OF APPELLEE**

-25-

**HLT's 1999 Preference Data vs. UFP's 1996 through 1998 Pre-Preference Data**



P54.

Notwithstanding the stated terms of 1% 7, net 8, the credit limit truly dictated the timing of Hechinger's wire transfers to UFP.  As testified by Cliff Smith for Hechinger, "the stores purchase between 160 and $250,000 a day of product.  So every third day a $500,000 wire was about right, you know, for that time period." TT 220.  Mr. Smith also testified " -- my goal was to keep them at a million dollars in credit . . . based on the information that I had, that's what I tried to do was keep them -- keep us owing them a million dollars." TT 220.  Due to the "secret" slow shipping, Mr. Smith did not have correct information. P35.

Therefore, UFP's exposure with respect to Hechinger's account was drastically reduced from the previous peak buying season. P12b.  This is illustrated by the following:



P12b.   Hechinger's outstanding daily balance with UFP during the Preference Period ranged from $1 million owed to a $1 million credit balance. P12b.  The same 90-day period in 1998 was dramatically different; Hechinger's outstanding daily balance was always greater than $1 million, and was generally between $3 million and $4 million. P12b.  On June 5, 1998, Hechinger owed UFP $3.5 million. P12b.  On June 5, 1999, UFP actually **owed Hechinger** nearly $1.5 million. P12b.   This is approximately a $5 million difference in UFP's exposure on the exact same date the year prior. P12b.  This difference illustrates not only the difference in the Parties' dealings, but the extent of UFP's preference as a creditor.

**BRIEF OF APPELLEE**

**2.    Defendant Failed to Meet Its Burden Under 11 U.S.C. §547(c)(2)(C), And The Bankruptcy Court Properly Found That The Transfers Failed To Meet The Definition Of Ordinary Business Terms In The Industry**

The Bankruptcy Court was "compelled" to find that UFP did not meet its burden of proving, under 11 U.S.C. § 547(c)(2)(C), that the Transfers during the Preference Period were made according to "ordinary business terms." Opinion, p. 17, 19. The Court found the "normal" terms employed by UFP with "Big Box" customers were unlimited credit limits and 30-day payment terms. Opinion, p. 18. These were the terms UFP extended to Hechinger for over fifteen years, but changed drastically shortly before the Preference Period. TT 34, 61. The Court stated:

> It is clear in *Molded Acoustical*, that the Court intended to permit a creditor with a lengthy relationship with its customer to "vary its credit terms from the industry norm" over the life of the relationship, and not to permit eleventh hour changes of substantial magnitude when the positions of the parties is vastly different than when the relationship began.

Opinion, p. 19. The lengthy relationship between the Parties was consistent with the industry norm for over fifteen years. It was UFP's eleventh hour changes to the relationship, when Hechinger's financial condition had seriously deteriorated and its bargaining position had weakened, that deviated from "ordinary business terms."

The evidence at trial showed UFP's treatment of Hechinger's account was not normal with respect to the pressure treated lumber industry. TT 92-93, 117-118. Mr. Schumaker testified:

> Q.    Okay. Now isn't it true that for the big box stores, I believe you already testified, that they had unlimited credit historically with your company.
> A.    Yes.
> Q.    Okay. And isn't it also true that notwithstanding the 200 or so terms that you just talked about before we took a break, that the standard term for these big box stores was the 1% 10, net 30?
> A.    Correct.

> Q.   So that all those other terms really don't apply to the big box stores?
>
> A.   In some cases they could.  If we had special programs going, but for the most part, standard terms was the 1% 10, net 30.

TT 92-93.  The 1% 7, net 8 terms and the restrictive $1 million credit limit imposed on Hechinger by UFP were not the norm for the sale of pressure treated lumber to "big box" retailers like Hechinger.  When questioned regarding UFP's collection practices, Mr. Schumaker described its use of a slow down:

> A.   Slow down meant that we would just -- instead of shipping all the orders that were due today, we'd slow down the shipments, get the stores the ones that they needed.
>
> Q.   That's another collection tool, isn't it?
>
> A.   Yes.
>
> Q.   Okay, because by slowing down the shipments you're reducing your credit exposure but you're still giving the customer something?
>
> A.   Correct.
>
> Q.   And the word "silent slow down," is it reasonable to assume that means just don't tell the customer that you're slowing down shipments?
>
> A.   Correct.
>
> Q.   And you were aware that was done, at least in this one instance, with regard to Hechinger?
>
> A.   Yes.
>
> Q.   And that wouldn't be normal or ordinary in your business to do that for a top 10 customer, would it?
>
> A.   Unless you're in financial distress.
>
> Q.   Right.  So if they were a healthy, arms length, you know, everything's going fine, you wouldn't extend -- you wouldn't do secret slow downs of their shipments?
>
> A.   Correct.

TT 117-118.

"[O]rdinary terms are those which prevail in healthy, not moribund creditor-debtor relationships."  Molded Acoustical, 18 F.3d at 227.  When asked whether any of UFP's top ten customers in terms of 1998 sales had a credit limit, Mr. Schumaker testified, "They would all have open credit lines."  P4, pp. 10-20.  Mr. Schumaker previously testified that, in its entire history,

**BRIEF OF APPELLEE**

UFP has only treated two other customers in this fashion out of thousands, both of which filed bankruptcy. P4, pp. 22-23. Thus, the slow down and attending credit limit were in violation of prevailing industry standards.

Mr. Schumaker admitted that UFP's treatment of Hechinger was not ordinary in the Defendant's industry, let alone between the Parties:

> Q.    Now, would it be ordinary in your business to receive flat payments or even dollar amounts from large vendors, such as Hechinger, on a current or normal basis in 1999?
>
> Mr. McElwee: Object to the form of the question.
>
> (By Mr. Steinfeld). You can answer.
>
> A.    No.
>
> Mr. McElwee:  Using the word ordinary, I think, is improper in this preference case because it has a legal term that may not correspond.
>
> (By Mr. Steinfeld).  You answered no to that question, but then I will ask you –
>
> A.    Right.
>
> Q.    – that was not ordinary?
>
> **A.    It was not ordinary.**

(emphasis added) P4, pp. 59-60.

Contrary to UFP's argument, payment within terms does not obviate Defendant's burden under 11 U.S.C. §547(g) to prove the consistency of subject payments with prevailing industry norms.  The evidence presented overwhelmingly supports the Court's holding that the payments herein were not commensurate with "ordinary business terms."

### 3.    Defendant's Arguments Reflect A Misunderstanding Of The Law And Rely Heavily On Non-Precedential Cases Not Followed By The Third Circuit

It is understandable that UFP disagrees with the Bankruptcy Court's findings and judgment. Nevertheless, the Opinion reflects a thorough consideration of the evidence presented at trial and the applicable law. The Court's well-reasoned resolution of peculiarly factual questions cannot be challenged.

UFP spends considerable time discussing Hechinger's agreement to a credit limit and restricted terms. Yet the Court found Hechinger had "little or no choice but to accede to the lesser of the four unsatisfactory options presented by UFP" given the timing of UFP's demands, just prior to Hechinger's peak season for the sale of treated wood products. Opinion, p.12. This factual finding, supported by the testimony of Cliff Smith, as well as UFP's witness, cannot be second-guessed. TT 218, 183.

UFP also asserts that "payments made within agreed terms are presumptively ordinary." UFP Brief, p. 12. The cases upon which UFP relies for this proposition are not binding in the Third Circuit, nor do the cases wholly support UFP's contentions, as follows:

- In re Kiddy Toys, Inc., 178 B.R. 928 (Bankr.D.P.R. 1994). Although "[p]ayments made within the time allotted by the contract provisions between the debtor and creditor best exemplify normal business relations," they should not be viewed as "exclusively indicative of the 'ordinary course of business.'" Id. at 934. Further, the parties in Kiddy Toys continued to do business primarily on net 30 day terms during the preference period, and the Court found no evidence of collection pressure. Id. at 935.

- In re Daedalean, Inc., 193 B.R. 204 (Bankr.D.Md. 1996). The Daedalean Court uses a presumption of ordinariness for a payment made within terms. Id. at 212. "However, 'there is no precise legal test which can be applied' in determining whether payments by the Debtor during the ninety day preference period were

'made in the ordinary course of business'; 'rather, th[e] court must engage in a 'peculiarly factual' analysis.'" Id. at 211.

- In re Tennessee Valley Steel Corp., 201 Bankr. 927 (Bankr.E.D.Tenn. 1996). The Tennessee Bankruptcy Court found the payments made within contractual terms ordinary, but there was no change in the contractual terms and no collection pressure (only a variance in payment within the terms). Id. at 936.

- In re Deliland Foods Corp., 2005 WL 751929 (D.Del.). In this peculiarly factual analysis,
  the Bankruptcy Court considered the replacement by wire transfer of a bounced check to be ordinary within the industry. Id. at *1. The District Court upheld. Id. This unique factual scenario has no bearing on the relationship between Hechinger and UFP, as it involved a single transaction between a debtor and creditor who had no previous relationship prior to the preference period.

- In re Brown Transport Truckload, Inc., 161 B.R. 735 (Bankr.N.D.Ga. 1993). The Georgia Bankruptcy Court held that a reduction in credit limit and payment by wire transfer did not destroy the OCB defense because changes in the credit limit had occurred for nine months and Defendant did not require the wire transfers be made. Id. "More drastic changes must be effected before payments are considered not to be ordinary." Id. at 740. UFP more drastically changed its relationship with Hechinger by requiring lump sum wire transfers prior to account reconciliation and by silently slowing and stopping shipments to eliminate any credit exposure.

- In re A.W. & Associates, Inc., 196 B.R. 900 (Bankr.N.D.Fl. 1996). A terms change from "2% 10th net 30 days" to "due 10th of the following month" did not destroy the ordinary course of business defense. Id. at 906. This change in terms was not substantial and could, depending on invoice date, give the Debtor more time to pay. The Florida Bankruptcy Court also found that an otherwise "normal" payment would not be considered ordinary if made in response to a creditor "refusing to deliver new merchandise . . . ." Id.

Even if the Bankruptcy Court had agreed to a presumption of ordinariness for payments within terms, UFP's "substantial restrictive changes" to its relationship with Hechinger immediately prior to the Preference Period "compelled" the Court to conclude the payments were not ordinary. Opinion, p. 16-17. UFP's collection actions during the Preference Period could clearly be termed

BRIEF OF APPELLEE

"different, unusual, or additional action to collect a debt," as referred to in In re CM Holdings, Inc.,

264 B.R. 141, 154-55 (Bankr.D.Del. 2000).  UFP cut off Hechinger's credit by slow shipping

orders.  Ms. Nickels' collection plan was as follows:

> We have tightened our credit and will continue to try to keep our exposure at
> zero–BUT PLEASE don't discuss this.  They still believe they have a $1 million
> credit limit with us.  They are wire transferring to us based on orders in the system,
> but orders are starting to ship slower, so we have been able to stay ahead of the
> game. .. (capitalization original).

P45.  The citations by UFP of some non-precedential decisions does not change that the Transfers

at issue were made pursuant to unusual collection pressure as well as interruptions in shipment and

were therefore not ordinary between the Parties nor in UFP's industry.

### D.    THE BANKRUPTCY COURT PROPERLY DENIED DEFENDANT'S MOTION IN LIMINE #1 (SPOLIATION OF EVIDENCE)

UFP argues Hechinger's September 1999 destruction of some documents during its

liquidation and necessary downsizing, nearly two years prior to the filing of this adversary

proceeding in June 2001, included documents that were relevant hereto and that any documents

that may have existed would support its defenses.  UFP is wrong.  UFP states that "literally every

paper file in Hechinger's archives was destroyed.  Contract documents, e-mails, correspondence,

memos, and all the 'vendor files,' including all of the files relating to UFP, were lost as a result."

UFP Brief, p. 30.  Also, "Literally every physical file Hechinger possessed was destroyed - literally

every one." UFP Brief, p. 35.  These statements are wholly inaccurate.

Hechinger invited UFP to depose the Plaintiff's witnesses regarding any records that had

been kept by Hechinger employees and the liquidation process itself.  Defendant did so and found

nothing to support its position.  James Iampieri testified that during its liquidation, Hechinger

instructed its employees to retain any documents believed to be important or necessary to litigation, including all payment records and documents and files related thereto as well as any and all contracts or agreements with vendors. D63, pp. 43-44. Mr. Iampieri also testified that various personnel at Hechinger, including himself, searched locations in Largo, Maryland and Virginia Beach, as well as a warehouse in Upper Marlboro, Maryland, **all of which contained files and records of the Debtor**, in order to produce documents responsive to UFP's requests. D63, pp. 35-39. Many of Defendant's exhibits are **original accounts payable records including remittances and handwritten notes** made by Hechinger employees involved in the wire transfer and reconciliation process. D8 through D29. Consequently, many relevant documents survived the downsizing process and were produced by Plaintiff in discovery.

It was simply impossible for the Debtor to maintain all of its records and physical files in the liquidation process, and the majority of the information in the vendor physical files was irrelevant to litigation and/or duplicative of electronic information and personal knowledge. D63, pp. 39-43. The destruction of documents occurred long before the decision was made to file any preference lawsuits against vendors, and no documents were destroyed with the intent to deceive or hide damaging evidence. D63, p. 35. Mr. Iampieri testified "We have completed an exhaustive, extremely laborious process of extracting from our electronic files any and all communications that may have been in the remotest way connected to Universal and the results of that effort, as well as a rechecking of all the areas that I had mentioned before where there might have been hard copies of documents related to Universal and the results of those efforts have been produced to Universal." D63, p. 55.

Cliff Smith, who dealt with the UFP account on a daily basis at times during the Preference Period, testified:

Q    Did you ever make notes?
A    Occasionally
Q    Did you ever send e-mails?
A    No.  We didn't use e-mails much at all.
Q    Did you ever create any written documents of any kind or description?
A    There was a Universal Forest Products file, but I guess when we went through the, you know, clean out to move out of the building, it must have been went away. I'm sure there wasn't a whole lot of stuff in there.  It was -- at that point in time, it was a very dynamic situation on a day-to-day basis in the office.  I'd have, you know -- I would be back up 10 to 15 people between employees and, you know, talking to vendors and letting them know our financial position and so on and so forth.  I mean, I was running at 200 miles an hour pretty much.
Q    A lot of fires to put out.
A    Yes.
Q    And so there wasn't time to write a lot of letters and make a lot of notes?
A    It wasn't necessary.
Q    Why not?
A    It wasn't necessary.  Well, traditionally, usually in retail, the vendor gives the majority of correspondence.
Q    What does that mean?
A    Well, just like when Beth and I had the phone call and she talked about going cash only and I told her you're done, she says well let me put some options together, and I'll send it to you in a letter.  And we'll set up a meeting, fine, and then you move on to the next thing.  And then when the letters come in, you read them and make sure it's specifically what you wanted.

P7, pp. 35-36. Further, Plaintiff produced internal Hechinger memorandums and notes, from Cliff Smith and regarding merchandising in UFP's department.  *See* D50, D51, D53, D55, and D57.

UFP maintained complete records of its dealings with Plaintiff.  It has produced no documents from Hechinger evidencing intent of the parties to do business on anything other than credit terms.  Further, UFP's witnesses testified that UFP represented to Hechinger that Hechinger had a $1 million credit limit throughout the Preference Period. TT 83.  Additionally, UFP's own

documents evidence that UFP knew Hechinger would not do business contemporaneously.  P45.

Ms. Nickels confirmed UFP's unilateral actions were designed to receive payments faster than

shipments were going out and eliminate UFP's exposure:

> **We have tightened our credit and will continue to try to keep our exposure at zero–BUT PLEASE don't discuss this.  They still believe they have a $1 million credit limit with us.  They are wire transferring to us based on orders in the system, but orders are starting to ship slower, so we have been able to stay ahead of the game. ..** (capitalization original).

> **Brian is managing the situation on a daily basis, and thus far HQ has followed through on every one of our requests for wires.**

(emphasis added) P45.  Thus, Defendant's own records indicate that, to the extent additional

documents may have existed in Hechinger's records, the same would have weakened, not

strengthened, Defendant's purported defenses.

There is no evidence any relevant documents to support UFP's defenses existed, nor is

there any evidence of wrongful intent on Hechinger's behalf in the discard of documents.

Therefore, there should be no unfavorable inference drawn from Hechinger's routine document

destruction.

Third Circuit case law establishes that an adverse inference or presumption that relevant

documents were destroyed to prevent the contents from harming a party arises "**only when the**

**spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire**

**to suppress the truth, and it does not arise where the destruction was a matter of routine**

**with no fraudulent intent.**" Brewer v. Quaker State Oil Refining Corporation, 72 F.3d 326, 334

(3d Cir. 1995) (emphasis added).  A court may draw an adverse inference when documents have

been destroyed that are relevant to an issue in a case. Id.  For this rule to be applied, however, "it

**BRIEF OF APPELLEE**

is essential that the evidence in question be within the party's control"… and " it must appear that

there has been **an actual suppression or withholding of the evidence**." Id. (emphasis added).

The Third Circuit also found that it is important to look at a specific case and analyze the degree

of fault of the party accused and the degree of prejudice to the defendant. Schmid v. Milwaukee

Electric Tool Corp., 13 F.3d 76, 79-80 (3d Cir. 1994).

When considering the three factors outlined in Schmid, Hechinger has a low degree of fault

and personal responsibility in the destruction of documents because it was paring down space in

a liquidation and the destruction occurred years prior to any lawsuit or decision to institute lawsuits.

13 F.3d at 80.  Since there were actual witnesses from Hechinger directly involved in the

transactions who testified at trial, witnesses from UFP who testified about the relationship, and a

number of relevant documents, **the best evidence already exists** and there is no prejudice to

UFP.  No sanctions are necessary because there were no improper actions by Hechinger to be

deterred and all essential evidence exists.

The other cases cited by UFP, wherein some courts applied an adverse inference or

sanctions, all include facts outlining that documents were intentionally and willfully destroyed during

litigation or were the only evidence available.  That is simply not the case here.

UFP mis-quotes from Nation-Wide Check Corp. v. Forest Hills Distributors, Inc., 692

F.2d 214, 218 (1st Cir. 1982), wherein a court in the First Circuit applied an adverse inference.

UFP Brief, p. 32.  In that matter, a specific "document" was destroyed (rather than "evidence" as

quoted by the Defendant) after the party had notice that the document was relevant to ongoing

litigation..  Further, UFP incorrectly states that Nation-Wide cites to Schmid, one of the leading

**BRIEF OF APPELLEE**

Third Circuit decisions. UFP Brief, p. 32.  As <u>Schmid</u> was decided by the Third Circuit in 1994, this is impossible. 13 F.3d at 76.

Defendant also argues that the remedies it seeks are triggered in Hechinger's situation. UFP cites a Delaware District Court's finding, in a matter where evidence was intentionally and knowledgeably destroyed, that "[p]arties to existing or anticipated litigation have an affirmative duty to preserve evidence that 'might' be relevant to the issues in the lawsuit." <u>In re Wechsler</u>, 121 F.Supp.2d 404, 415 (D.Del. 2000).  In <u>Wechsler</u>, the District Court also held "No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." <u>Id.</u> at 416.  Here, there is no specific document lost or accidentally destroyed, and the failure to produce other documents UFP believes **should** exist is properly accounted for and explained. If there was any destruction by Hechinger of documents relevant to UFP, it was clearly inadvertent and unintentional with respect to this litigation.

In spite of actual destruction, when there is a lack of intent – *i.e.*, if a court finds that documents were not produced due to destruction unrelated to the lawsuit, refusal to draw an adverse inference is proper. <u>Brewer</u>, 72 F.3d at 334.  In <u>Brewer</u>, a relevant file was lost or destroyed following the death of an attorney.  <u>Id.</u>  The Third Circuit found the failure to produce "could have been due to many reasons unrelated to the lawsuit" and held that the district court properly refused to draw an adverse inference. <u>Id.</u>

UFP also argues Hechinger had a duty to preserve all its records because it had filed bankruptcy and therefore had **the option** to pursue Chapter 5 claims under the Bankruptcy Code.

**BRIEF OF APPELLEE**

UFP Brief, p. 33.  Defendant cites <u>Wm.T. Thompson v. General Nutrition Corp., Inc.</u>, 593 F.Supp. 1443 (C.D.Cal. 1984), in support of its position that "Hechinger knew or should have known at the time that its records were relevant and discoverable, and therefore had a duty to preserve them." UFP Brief, pp. 33, 35.  In <u>Wm.T. Thompson</u>, a Pennsylvania District Court issued an order requiring preservation of certain records and later ordered a party to produce certain records. <u>Id.</u> at 1446.  The Court found the only appropriate remedy to be dismissal only after the party therein refused to produce the records and then destroyed them. <u>Id.</u> at 1456.

In this matter, Hechinger did not destroy any specific documents relevant to this litigation, nor did any document destruction occur temporally close to the inception of this litigation.  If what Defendant argues were true, every company that filed bankruptcy would be required to retain every piece of paper it has, regardless of space or the cost, if it has the possibility of becoming involved in any lawsuit, even years later.  Such a requirement would be untenable.

UFP properly notes that an inference would have been an insufficient remedy herein because UFP bears the burden of proof with regard to the contemporaneous exchange defense. UFP Brief, pp. 34, 36.  UFP also properly notes that the United States District Court for the District of Delaware has held that ". . . the spoliation inference cannot serve as a substitute for actual evidence . . . ." <u>Wechsler</u>, 121 F.Supp.2d at 428.  Not only is an adverse inference an insufficient remedy in the matter at hand, it is nonsensical because it would require the Court to completely disregard the actual testimony of live witnesses from Hechinger (and UFP) and the documentary evidence that establishes a credit limit and Hechinger's intent to use and apply the credit limit throughout the Preference Period.

**IV. CONCLUSION**

The Court properly found that Defendant failed to meet its burden with respect to its 11 U.S.C. § 547(c)(1) and (c)(2) defenses. The Court's findings of fact are supported by the evidence in the record, and Defendant's challenge is specious. Additionally, the Court's ruling on spoilation should stand. Finally, Plaintiff hereby requests this Court reverse the Bankruptcy Court's unsupported denial of pre-judgment interest and remand for findings and an entry of pre-judgment interest in the amount of $283,820.76, for a total judgment of $1,288,036.76.

Dated: November 23, 2005          By:   /s/ John T. Carroll, III
Local Counsel                     COZEN AND O'CONNOR
                                  John T. Carroll, III, Esq., DE SBN 4060
                                  Chase Manhattan Centre
                                  1201 North Market Street, Suite 1400
                                  Wilmington, DE  19801
                                  **Telephone:** (301) 295-2000 **Fax:** (302) 295-2013

                                          and

Primary Counsel
                                  Joseph L. Steinfeld, Jr.,  DC SBN 297101,
                                  MN SBN 0266292, VA SBN 18666
                                  Kelly J. Shannon, Esq., MN SBN  0300469
                                  Kelly L. Mangan, Esq., WI SBN 1032576,
                                  MN SBN 0317901
                                  A•S•K FINANCIAL, LLP
                                  2600 Eagan Woods Drive, Suite 220
                                  Eagan, MN  55121
                                  **Telephone:** (651) 406-9665 **Fax:** (651) 406-9676

                                  Co-Counsel  For  Plaintiff,  Hechinger Investment
                                  Company of Delaware, Inc., Debtor in Possession

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Bk. No. 99-02261-PJW<br>(Jointly Administered) |
| Hechinger Investment Company of Delaware, Inc., *et al*,<br><div align="right">Debtor,</div> | Chapter 11 |
| Hechinger Liquidation Trust, as successor in interest to Hechinger Investment Company of Delaware, Inc., *et al.*, Debtors in Possession,<br><div align="right">Plaintiff,</div><br>vs. | Civil Action Nos. 05-497 and 05-498 (KAJ) |
| Universal Forest Products, Inc.,<br><div align="right">Defendant.</div> | |

## CERTIFICATE OF SERVICE

I, JOHN T. CARROLL, III, hereby certify that on November 23, 2005, I caused a copy of the foregoing document to be served on the parties set forth below, via the manner specified.

| | |
|---|---|
| Michael S. McElwee | Kevin Mangan |
| Varnum, Riddering, Schmit & Howlett LLP | Monzack and Monaco, P.A. |
| 251 N. Rose Street, 4th Floor | 1201 N. Orange Street, Suite 400 |
| Kalamazoo, MI 49007-3823 | Wilmington, DE 19801 |
| **VIA FEDEX** | **VIA HAND DELIVERY** |

Dated: November 23, 2005
        Wilmington, DE

Local Counsel

By      /s/ John T. Carroll, III
        COZEN O'CONNOR
        John T. Carroll, III, Esq. (4060)
        Chase Manhattan Centre
        1201 North Market Street, Suite 1400
        Wilmington, DE  19801
        Telephone: (302) 295-2000   Fax: (302) 295-2013